**Kathleen S. O'REILLY, Plaintiff,**

v.

**TRANSWORLD HEALTHCARE, INC., W. James Nicol, Andre C. Dimitriadis, Dr. Timothy J. Triche and D. Mark Weinberg, Defendants.**

**C.A. No. 16507.**

Court of Chancery of Delaware.

Submitted: March 23, 1999.
Decided: Aug. 20, 1999.

Ronald A. Brown, Jr. and Elizabeth M. McGeever of Prickett, Jones, Elliott, Kris-tol & Schnee, Wilmington, Delaware, for Plaintiff.

A. Gilchrist Sparks, III and Donna L. Culver of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Elliott Silverman of McDermott, Will & Emery, New York City, of counsel, for Defendants.

## OPINION

STEELE, Vice Chancellor.

Defendants Transworld Healthcare, Inc. ("Transworld") and the former directors of Health Management Inc. ("HMI") move to dismiss pursuant to Court of Chancery Rule 12(b)(6) this individual and stockholder class action against them, which challenges the fairness of HMI's merger with a subsidiary of Transworld. HMI's directors approved a merger between HMI and Transworld's wholly-owned subsidiary at $2 per share, but agreed to reduce the merger consideration to $1.00 per share, and then to $.30 per share after two revelations of accounting errors in HMI's financial statements. During HMI and Transworld's negotiations, a second bidder, Counsel Corp., opened up acquisition talks with HMI. HMI did not pursue merger negotiations with Counsel Corp. After HMI's stockholders approved the merger with Transworld's subsidiary, but before the merger was consummated, Transworld agreed to sell HMI's assets to Counsel Corp. Following the merger, Transworld sold HMI's assets to Counsel Corp. at a profit.

Plaintiff O'Reilly alleges that Transworld leveraged its 49% ownership of HMI's outstanding voting stock, its option to purchase 2% of HMI's stock, and its $49 million in HMI debt holdings at the time of the renegotiations to squeeze unfair concessions from a financially ailing HMI and to prevent HMI from negotiating with Counsel Corp. so that Transworld could resell HMI's assets to Counsel Corp. at a higher price. She alleges that the Defendants breached their duty of disclosure in

a Proxy Statement issued in connection with the merger and that the merger process and price were unfair.

Because O'Reilly asserts well-pleaded allegations that: (i) Transworld was an HMI controlling stockholder with concomitant fiduciary status; (ii) the HMI directors' conduct falls within the exceptions of HMI's certificate of incorporation's exculpation provision tracking the language of 8 Del.C. § 102(b)(7); (iii) the merger's Proxy Statement contained false statements regarding Transworld's purpose for engaging in the merger and the "arms-length" nature of the merger negotiations; and (iv) the merger process and price were unfair, I deny in part Defendants' motion to dismiss.

Because O'Reilly fails to set forth well pleaded allegations in support of certain other claims against Defendants for breach of the fiduciary duty of disclosure, I grant in part Defendants' motion.

## I. Background [1]

### A. The Parties

Defendant HMI, a Delaware corporation, provided pharmaceutical management to patients with long-term medical conditions and similar health-related services. Defendants Nicol, Dimitriadis, Triche, and Weinberg were HMI's four directors. On October 1, 1997, HMI merged with a wholly owned subsidiary of Defendant Transworld (the "Merger"). Transworld is a New York corporation that is a regional provider of a broad range of healthcare services and products. Plaintiff O'Reilly owned 2,600 shares of HMI stock at the time of the Merger.

### B. The Events Leading up to Merger Negotiations

In the Spring of 1996, HMI's board of directors learned that HMI's financial statements going back to 1994 were inaccurate. HMI restated its financials, which revealed significant deterioration in HMI's financial condition. To account for the restated finances, HMI recorded special charges in 1995 and 1996 including reductions in working capital, retained earnings and stockholders' equity. For 1996, HMI reported a net operating loss of over $8 million, reflecting, among other things, a $2.8 million write off for medical device inventory, a $3.6 million charge for reorganizational costs, and an $8.4 million reserve to allow for an increase in doubtful accounts. As a result, HMI defaulted on its loan agreements. The board responded to this crisis by hiring National Westminster Bank Plc ("NatWest") to assist HMI in evaluating a number of strategic and financial options. After rejecting the possibility of a private security placement, HMI's board began looking for someone willing to acquire the ailing company.

### C. HMI's Negotiations And Agreements with Transworld

In October 1996, HMI met with Transworld. On November 13, 1996, HMI and Transworld entered into a stock purchase agreement (the "Stock Purchase Agreement") and a merger agreement (the "Merger Agreement"). Pursuant to the Stock Purchase Agreement, Transworld agreed to acquire 49% of HMI's outstanding voting stock and Transworld acquired an option to purchase an additional 2% of HMI's outstanding voting stock. Transworld paid the following consideration for the HMI stock under the Stock Purchase

---

1. The facts recited are as alleged in the Complaint and the Proxy Statement. It is appropriate for me to consider the Proxy Statement in this instance because it is integral to Plaintiffs' claim and is incorporated into the Complaint. See Vanderbilt Income and Growth Assoc., L.L.C. v. Arvida/JMB Managers, Inc., Del.Supr., 691 A.2d 609, 613 (1996) (citing In re Santa Fe Pac. Corp. Shareholder Litig., Del. Supr., 669 A.2d 59, 70 (1995)). O'Reilly in her Complaint relies on the Proxy Statement to set forth the facts surrounding the merger. The alleged misdisclosures underlying O'Reilly's claim for breach of the fiduciary duty of disclosure, furthermore, were made in the Proxy Statement.

Agreement: (i) $1 per share; (ii) Transworld's agreement to execute the Merger Agreement; (iii) Transworld's purchase of the rights of HMI's senior lenders under HMI's credit agreements; (iv) Transworld's extension of the expiration of a forbearance agreement which HMI had entered into with its senior lenders; (v) Transworld's agreement to lend additional amounts under HMI's revolving credit facility, subject to certain conditions; and (vi) Transworld's cancellation of warrants held by the lenders that Transworld was effectively replacing. Pursuant to the Merger Agreement, Transworld agreed to acquire HMI's publicly-traded stock for $2.00 per share. HMI's board obtained an opinion from NatWest which stated that from a financial perspective the $2.00 per share Merger price was fair to the non-Transworld HMI's stockholders.

As contemplated by the Stock Purchase Agreement, Transworld: (i) acquired HMI's bank debt; (ii) extended the termination date of the pre-existing forbearance agreement HMI had entered with its senior lenders, which was to terminate on November 15, 1996, to December 12, 1996; and (iii) promised to lend up to an additional $3 million to HMI under HMI's revolving line of credit. In November and December 1996, Transworld's principal stockholder, Hyperion Partners II L.P., acquired approximately $18 million in additional debt which HMI owed to various entities. As a result, Transworld and one of its affiliates owned virtually all of HMI's debt.

In January of 1997, Transworld informed HMI that because of HMI's "adverse business results," Transworld would exercise its right to decline to consummate its agreement to purchase 49% of HMI's stock and the Merger Agreement, unless the Merger price were renegotiated to $1.50 per share. The HMI board unanimously agreed, and on January 13, 1997, Transworld and HMI signed an amended merger agreement reflecting, among other things, the reduced Merger price. The

HMI board received another "fairness opinion" from NatWest declaring the $1.50 per share Merger price to be fair. Also on January 13, 1997, Transworld consummated the purchase of 49% of HMI's outstanding voting stock, as contemplated in the Stock Purchase Agreement.

After reviewing Transworld's due diligence findings, on January 14, 1997, HMI hired BDO Seidman, LLP ("BDO Seidman") to review HMI's accounts receivable. BDO Seidman discovered that HMI's financial statements for the first three-quarters of fiscal 1997 were inaccurate. Written analyses of BDO Seidman's findings were distributed to the HMI board and Transworld. After reviewing the analyses, Transworld concluded that HMI's equity had no value. Transworld informed HMI that, if Transworld had not already had a substantial equity investment in HMI, it would not wish to pursue the Merger.

According to the Proxy Statement, on March 13, 1997, Transworld demanded that HMI drop the Merger price for the public shares to $.05 per share or it would not consummate the Merger. HMI responded with a counteroffer of $1 per share. Transworld refused, making a "last and final offer" of $.30 per share. HMI's board accepted. On March 26, 1997, a second amendment to the Merger Agreement was executed, reflecting the reduction in the Merger price from $1.50 per share to $.30 per share. HMI did not obtain a fairness opinion with respect to the reduced $.30 per share Merger price.

## D. Counsel Corp. Expresses Interest in HMI

On March 26, 1997, one of HMI's competitors, Counsel Corp., sent HMI a letter expressing an interest in discussing the acquisition of a primary line of HMI's business. Initially HMI's board did not respond to the letter. On May 8, 1997, a representative of Counsel Corp. contacted HMI's lawyers to express again Counsel Corp.'s interest in acquiring a primary line

of HMI's business. Counsel Corp.'s representative indicated that Counsel Corp. could make a cash offer, but that Counsel Corp. would have to conduct a due diligence investigation before it could make any type of proposal. On May 10 and May 19, 1997, the HMI board met and decided not to pursue further discussions with Counsel Corp. At these board meetings, the HMI board considered the fact that the Merger Agreement contained provisions expressly limiting any discussions with potential acquirers and that Transworld had indicated that at that late date the disclosure of confidential information to, and HMI's continuing discussions with, Counsel Corp. would jeopardize the Merger. According to the Proxy Statement, the HMI board also considered the following: (i) Counsel Corp. had extensive discussions with HMI in July and November of 1996, and in each case indicated that any transaction with Counsel Corp. would yield no value to HMI's stockholders; (ii) HMI's financial condition actually was less favorable than that presented in July and November of 1996, as indicated in part by the restatements of the first and second quarter 1997 financial statements; and (iii) Counsel Corp.'s expression of interest was for only a portion, but not all, of HMI. The Proxy Statement also stated that the HMI board concluded that the potential damage of providing additional confidential information to Counsel Corp., a competitor, and of jeopardizing the Merger was greater than the possibility that a transaction with the competitor would actually occur and would actually result in additional value to HMI's stockholders and creditors.

**E. The Proxy Statement & HMI Directors' Conflicts of Interest**

On June 16, 1997, HMI mailed its stockholders the Proxy Statement for the Merger in which the HMI board recommended that the HMI stockholders vote in favor of the Merger. The Proxy Statement noted that two of HMI's four directors had possible conflicts of interest in approving the Merger. Defendant Nicol, HMI's CEO, President and board member, agreed to continue in his officer positions until HMI filed a certificate of merger with the Delaware Secretary of State and he stood eligible to receive cash payments contingent upon consummation of the Merger. Nicol had also been advised that the value of his employment contract in a bankruptcy scenario, the likely alternative to the Merger, was dubious. Defendant Dimitriadis, HMI's Chairman, was a defendant in a derivative lawsuit. HMI management believed that the plaintiffs in that action might lose their standing if the Merger were consummated. Furthermore, Dimitriadis would be at a substantial risk of losing an advance toward legal fees and indemnification if HMI were to file for bankruptcy. Thus, the Proxy Statement revealed that Dimitriadis stood in a much better position to receive advanced fees and/or indemnification if HMI merged with Transworld's subsidiary.

**F. HMI Stockholders Approve the Merger & Transworld Agrees to Sell Assets to Counsel Corp.**

On July 11, 1997, HMI had a special stockholders meeting at which the HMI stockholders approved the Merger. On August 1, 1997, however, Transworld announced that its bank disapproved financing for the Merger. HMI announced that if the Merger fell through and Transworld enforced its creditor rights, HMI might be required to file for bankruptcy. Two weeks later, Transworld entered into an agreement with Counsel Corp. pursuant to which Counsel Corp. agreed to purchase HMI's assets, either from Transworld or directly from HMI, for $40 million. On October 1, 1997, Transworld consummated the Merger and on October 10, 1997, Transworld sold HMI's assets to Counsel Corp.

**G. HMI Stockholders Exercise Appraisal Rights & O'Reilly Files this Action**

Certain HMI stockholders dissented from the Merger and sought appraisal.

That action, filed February 3, 1998, currently lacks a plaintiff.[2] O'Reilly, meanwhile, filed this action. She challenges the Merger on two grounds: (1) that HMI's directors and Transworld, its alleged controlling stockholder, breached their duty of disclosure by failing to disclose accurately material aspects of the Merger and (2) that the negotiation process and Merger price were unfair. Defendants believe Plaintiff inadequately pleaded both claims, that they, therefore, fail to state claims upon which relief may be granted and that the Complaint should be dismissed.

## II. LEGAL STANDARD

In evaluating Defendants' motion to dismiss, I assume the truthfulness of all well-pleaded, nonconclusory allegations found in the Complaint, and I extend the benefit of all reasonable inferences that can be drawn from the pleadings to the non-movant, O'Reilly. To dismiss a claim, I must find that O'Reilly has either utterly failed to plead facts supporting an element of the claim or that under no reasonable interpretation of the facts alleged in the Complaint (including reasonable inferences) could O'Reilly state a claim for which relief might be granted. Notwithstanding Delaware's permissive pleading standard, I am free to disregard mere conclusory allegations made without specific allegations of fact to support them.[3]

## III. PARTIES' CONTENTIONS & RULINGS OF LAW

This section sets forth O'Reilly's claims, Defendants' grounds for moving to dismiss

them, O'Reilly's response, and my ruling on each issue.

## A. O'Reilly's Allegation that Transworld is a Controlling Stockholder with Concomitant Fiduciary Status

O'Reilly claims that before the Merger, Transworld was HMI's controlling stockholder and, therefore, owed fiduciary duties to the other HMI stockholders. Under Delaware law,

> A shareholder who owns less than 50% of a corporation's outstanding stocks does not, without more, become a controlling shareholder of that corporation, with a concomitant fiduciary status. For a dominating relationship to exist in the absence of controlling stock ownership, a plaintiff must allege domination by a minority shareholder through actual control of corporate conduct.[4]

Defendants argue that the Complaint fails to plead adequately that Transworld was HMI's controlling stockholder because the Complaint does not expressly allege that Transworld controlled HMI's corporate conduct. O'Reilly responds by arguing that a plaintiff can plead sufficiently that a stockholder has actual control of corporate conduct by alleging facts from which a stockholder's exercise of corporate control can be inferred, which O'Reilly maintains she has done. While the preferred complaint might be one that expressly alleges corporate control, I agree with O'Reilly.

First, Delaware follows a simple notice pleading standard.[5] To meet this standard and survive a Rule 12(b)(6) motion to dismiss, a plaintiff must make allegations in its complaint which provide the defendant with sufficient notice of the ba-

---

**2.** *Steinberg v. Health Management, Inc.,* Del. Ch., C.A. No. 16166. Vice Chancellor Balick dismissed the named plaintiffs and ordered HMI to notify all dissenters that they had the opportunity to assume prosecution of that action. To date, the action is without a lead plaintiff, but has not been dismissed.

**3.** *Wolf v. Assaf,* Del.Ch., C.A. No. 15339, mem. op. at 3–4, 1998 WL 326662, Steele, V.C. (June 16, 1998).

**4.** *Citron v. Fairchild Camera and Instrument Corp.,* Del.Supr., 569 A.2d 53, 70 (1989) (citations omitted).

**5.** *Byrne v. Lord,* Del.Ch., C.A. No. 14824, 1996 WL 361503, ltr. op. at 5, Chandler, V.C. (June 11, 1996).

sis for the plaintiff's claim.[6] In the context of pleading that a defendant was a controlling stockholder with concomitant fiduciary status, a plaintiff satisfies this standard when its complaint alleges facts sufficient to support an inference that the defendant had actual control of a corporation's conduct, even if the complaint fails to make that express allegation. The facts sufficient to support the inference provide the defendant with adequate notice of the basis for the plaintiff's claim that the defendant had actual control of the corporation's conduct.

Second, as stated above, when considering a Rule 12(b)(6) motion to dismiss, I am to extend the benefit of all reasonable inferences that can be drawn from the pleadings to the non-movant.[7] As a result, if in fact a plaintiff alleges facts from which one can reasonably infer that a stockholder controlled a corporation's conduct, I am to draw that inference despite the fact that the same facts also could support an inference less favorable to the plaintiff. Under both theories, the alleged facts supporting the reasonable inference overcome any failure by the plaintiff to plead expressly that the stockholder actually controlled the corporation's conduct.

In this instance, O'Reilly alleges facts which support the inference that Transworld controlled HMI's conduct with respect to the Merger and which provide Transworld with sufficient notice of the basis for her contention that Transworld was a controlling stockholder with concomitant fiduciary status. The Complaint alleges that Transworld was HMI's controlling stockholder because: (i) Transworld owned 49% of HMI's voting stock; (ii) Transworld held an option to purchase another 2% of HMI's outstanding voting stock; and (iii) Transworld owned substantially all of HMI's debt. In addition, the Complaint alleges that two of HMI's four directors had conflicts of interest because one of those directors would receive pay-

ments contingent on the Merger's consummation and both of those directors stood to benefit personally from the Merger's elimination of HMI's need to file for bankruptcy. Finally, as evidence of Transworld's actual control, the Complaint alleges that in response to Transworld's "threat" that it would not consummate the Merger unless the Merger price was reduced, HMI's board agreed to reduce the Merger price from $1.50 to $0.30, and that in response to Transworld's representation to HMI that HMI's negotiations with Counsel Corp. would place the Merger at risk, HMI's board refrained from negotiating with Counsel Corp.

On the basis of these allegations, one may reasonably infer that Transworld used its position as a large stockholder and creditor to dictate the terms of the Merger to HMI's board, to prevent the HMI board from negotiating with Counsel Corp., to force the HMI board to approve the Merger, and that HMI acceded to these demands because of Transworld's status and certain directors' interest in the Merger's consummation. Again, while the allegations in the Complaint could support inferences less favorable to O'Reilly, on a Rule 12(b)(6) motion to dismiss, I am to construe all well-supported inferences in favor of the non-moving party. On the basis of these allegations and the reasonable inferences that they support, I conclude that O'Reilly has provided Transworld with sufficient notice of the basis for her claim that Transworld had actual control of HMI's corporate conduct and that O'Reilly has sufficiently pleaded her claim that Transworld was HMI's controlling stockholder with concomitant fiduciary status.

Consequently, for the purposes of this motion, O'Reilly's claims will be evaluated under the favorable assumption that Transworld acted as a controlling stockholder with concomitant fiduciary status.

---

**6.** *Id.*

**7.** *See infra* pp. 911–12.

## B. The Exculpation Clause in HMI's Certificate of Incorporation Tracking 8 *Del.C.* Section 102(b)(7)

The HMI directors argue that the claims against them must be dismissed because they are immunized from personal liability by HMI's Certificate of Incorporation, which has a provision that track the language of 8 *Del.C.* § 102(b)(7). Article XI of HMI's Certificate of Incorporation, as amended on March 27, 1992, provides:

A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a directors, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware ·Corporation Law, as the same exists or hereafter may be amended, or (iv) for any transaction from which the directors derived an improper personal benefit.

(the "Exculpation Provision").

■ It is settled that 8 *Del.C.* § 102(b)(7) ("Section 102(b)(7)") and provisions tracking its language exculpate directors from liability where the factual basis for a claim for breach of fiduciary duty against the directors solely implicates a violation of the duty of care made in good faith.[8] Most recently in *Emerald Partners v. Berlin,* the Supreme Court said,

the shield from liability provided by a certificate of incorporation provision adopted pursuant to 8 *Del.C.* § 102(b)(7)

is in the nature of an affirmative defense. Defendants seeking exculpation under such a provision will normally bear the burden of establishing each of its elements. Here, the Court of Chancery incorrectly ruled that [plaintiff] was required to establish *at trial* that the individual defendants acted in bad faith or in breach of their duty of loyalty. To the contrary, the burden of demonstrating good faith, however slight it might be in given circumstances, is upon the party seeking the protection of the statute. Nonetheless, where the factual basis for a claim *solely* implicates a violation of the duty of care, this Court has indicated that the protections of such a charter provision may properly be invoked and applied.[9]

With the benefit of the Supreme Court's guidance, I now conclude that claims against directors can be dismissed pursuant to certificate of incorporation provisions tracking Section 102(b)(7) only where the complaint fails to plead sufficiently that the directors' conduct falls into at least one of the exceptions under which the directors are not afforded the provisions' protection.[10] Both Counts I and II of O'Reilly's Complaint meet this standard.

■ O'Reilly's Complaint sufficiently pleads that the directors' alleged disclosure violations were a violation of the duty of loyalty. While the HMI directors seem to contend that all disclosure claims involve only breaches of the fiduciary duty of care, that contention is wrong. Directors' disclosure obligations arise out of both the fiduciary duty of care and loyalty.[11] A

---

**8.** *See Emerald Partners v. Berlin,* Del.Supr., 726 A.2d 1215, 1224 (1999); *See also Frank v. Arnelle,* Del.Ch., C.A. No. 15642, slip op. at 27–28, 1998 WL 668649, Chandler, C. (Sept. 16, 1998).

**9.** *Emerald Partners,* 726 A.2d at 1223–24 (citations omitted).

**10.** I note that this pleading standard comports with the Supreme Court's statement in *Arnold v. Society for Savings Bancorp.,* Del.

Supr., 650 A.2d 1270, 1287 (1994), that "claims alleging disclosure violations that do not otherwise fall within any exception [of Section 102(b)(7)] are protected by Section 102(b)(7) and any certificate of incorporation provision ... adopted pursuant thereto."

**11.** *See Malone v. Brincat,* Del.Supr., 722 A.2d 5, 11 (1998) ("The duty of directors to observe proper disclosure requirements derives from the combination of the fiduciary duties of care, loyalty and good faith.") (citations omitted); *See also Cinerama Inc. v. Technicolor,*

claim for breach of the fiduciary duty of disclosure implicates only the duty of care when the factual basis for the alleged violation suggests that the violation was made as a result of a good faith, but nevertheless, erroneous judgment about the proper scope or content of the required disclosure.[12] However, where a complaint alleges or pleads facts sufficient to support the inference that the disclosure violation was made in bad faith, knowingly or intentionally, the alleged violation implicates the duty of loyalty.[13]

The Complaint in this instance alleges that the HMI directors "breached their fiduciary duty of disclosure to plaintiffs in a knowing, intentional and bad faith manner...." While the HMI directors argue that O'Reilly's allegation of their bad faith, knowledge and intent is a conclusory allegation on which I should not rely in determining whether O'Reilly's disclosure claims against the HMI directors should be dismissed pursuant to the Exculpation Provision, I disagree with their characterization of the allegations. Given the allegations in the Complaint of self-interest among two of HMI's four board members and the reasonable inference that the pleaded disclosure allegations were part of a plan to deceive HMI's stockholders in order to consummate the Merger and fulfill the two HMI directors' and Transworld's self-interests, I cannot conclude at this stage of the proceedings that O'Reilly's allegations of bad faith, knowledge and intent are merely conclusory. O'Reilly, therefore, has sufficiently pleaded that the

HMI directors' alleged disclosure violations implicated the duty of loyalty. The Exculpation Provision, now known to be an affirmative defense, does not act as a bar as a matter of law.

As already discussed in the preceding paragraph, the Complaint sufficiently pleads that the HMI directors knowingly, intentionally and in bad faith failed to meet their disclosure obligations. Aside from supporting the conclusion that O'Reilly's disclosure claim implicates the duty of loyalty, this pleading also calls into play the Exculpation Provision's second exception for "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law." Furthermore, O'Reilly's allegations of self-interest among two of HMI's directors further implicates the Exculpation Provision's fourth exception. Count I of O'Reilly's Complaint, therefore, meets the pleading requirements to survive a motion to dismiss the disclosure claims against the HMI directors despite the looming spectre of the Exculpation Provision.

 Count II of the Complaint sets forth an entire fairness claim. As explained later in this opinion,[14] O'Reilly has sufficiently pleaded that two of HMI's four board members were self-interested, and that the Merger was the result of an unfair process and unfair price. This claim against HMI's directors, therefore, implicates the duty of loyalty, and the Exculpation Provision cannot act as a bar as a

*Inc.*, Del.Supr., 663 A.2d 1156, 1163 (1995) ("A combination of the fiduciary duties of care and loyalty gives rise to the requirement that 'a director disclose to shareholders all material facts bearing upon a merger vote....' ").

12. *See Zirn v. VLI Corp.*, Del.Supr., 681 A.2d 1050, 1061–62 (1996) ("We agree with the Defendants and hold that the VLI directors are shielded from liability by 8 *Del.C.* § 102(b)(7) and the amendment to VLI's Certificate of Incorporation giving effect to that statutory provision. The record reveals that any misstatements or omissions that occurred were made in good faith. The VLI directors

lacked any pecuniary motive to mislead the VLI stockholders intentionally and no other plausible motive for deceiving the stockholders has been advanced. A good faith erroneous judgment as to the proper scope or content of required disclosure implicates the duty of care rather than the duty of loyalty. *Arnold I*, 650 A.2d at 1287–88 & n. 36. Thus, the disclosure violations at issue here fall within the ambit of the protection of section 102(b)(7).")

13. *See id.*

14. *See infra* p. 928–29.

matter of law. Although not raised by the Defendants, within O'Reilly's allegation that the Merger price resulted from an unfair process is an allegation that the HMI directors breached their duty of care when approving the Merger price. Unlike the disclosure claims, this allegation is not accompanied by an express allegation that the breach was made in bad faith, knowingly or intentionally. Again, however, it is reasonable to infer from the two HMI directors' self-interest and Transworld's self-interest and alleged threats, that these alleged violations of the duty of care were made to consummate the Merger and to fulfill their respective self-interests. As a result, these allegations of the directors' breach of their duty of care fall within the Exculpation Provision's second and fourth exceptions, and therefore, the Exculpation Provision cannot at this stage in the proceedings be a basis for dismissing that claim against the HMI directors.

## C. O'Reilly's Disclosure Claims

 O'Reilly claims that the Defendants breached the fiduciary duty of disclosure, a subset of the duty of loyalty arising when stockholder action is sought or required.[15] Corporate fiduciaries, including corporate directors, majority stockholders, and presumably minority controlling stockholders, have a duty to disclose all material facts when seeking stockholder action.[16] Material facts are those facts for which "there is a substantial likelihood that a reasonable person would consider [them] important in deciding how to vote."[17] Corporate fiduciaries can breach their duty of disclosure under Delaware law in a number ways—by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading.[18] O'Reilly alleges that Defendants breached

their fiduciary duty of disclosure in all three ways.

One should note that trial judges approaching issues similar to the appropriate analysis of directors' disclosure obligations in the context of a motion to dismiss a pleading feel much like field mechanics attempting triage on a disabled vehicle. The trial judge under enormous pressures of time and conflicting advice on how to diagnose and then make the repairs, has only experience and a sketchy field manual from the factory with which to work. Certain knowledge that the owners will immediately take the vehicle back to the factory for repair and that there are three or more mechanics, who prepared the field manual, who will then assess the nature and quality of the field repairs, make changes to them and/or send the vehicle back with instructions for additional work (often accompanied by a previously unknown, newly published supplement to the existing manual in the field) makes the task even more daunting. Nonetheless, the work must be done and I do so with an introductory attempt to outline principles that I think I have correctly discerned from the current version of the field manual.

 These are:

1. The duty of disclosure is a subset of the more general duties of loyalty, "good faith," and care and is implicated only when stockholder action is contemplated, i.e. requested or required. Disclosure violations arising out of communications not contemplating stockholder action implicate the broader fiduciary duties of loyalty, "good faith" and care.

2. Breaches of the duty of disclosure always impinge upon the stockholder franchise and stockholders' right to make an informed decision on corpo-

---

15. *Malone,* 722 A.2d at 10; *Jackson National Life Insurance Co. v. Kennedy, et al.,* Del.Ch., 741 A.2d 377, 389 (1999).

16. *See Malone,* 722 A.2d at 11 & n. 21.

17. *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 944 (1985).

18. *In re the Walt Disney Co. Derivative Litig.,* Del.Ch., 731 A.2d 342, 376 (1998).

rate affairs. A plaintiff, therefore, is entitled to *per se* nominal damages for a breach of the duty of disclosure. So long as the plaintiff pleads sufficiently the other specific elements of a breach of the fiduciary duty of disclosure arising from a false statement, omission or partial disclosure, a plaintiff may request nominal damages, without pleading causation or actual quantifiable damages.

3. A plaintiff who seeks more than nominal damages for breach of the duty of disclosure, however, must set forth in a well-pleaded complaint allegations sufficient to support the remedy sought. As a result, when a plaintiff requests more than nominal damages, a plaintiff also will have to plead causation and identify actual quantifiable damages in order to survive a motion to dismiss. Furthermore, in the event that the claim for breach of the fiduciary duty of disclosure arises from the misdisclosure of wrongdoing that underlies an accompanying claim challenging the fairness of the same transaction, the plaintiff will have to plead that the breach of the duty of disclosure created a cognizable harm discrete from the harm that the underlying wrongdoing caused, as well as the requisite causation and damages to support its request for more than nominal damages.

4. A well-pleaded disclosure claim arising out of a communication that does not contemplate stockholder action and which implicates the broader duties of loyalty, "good faith" and care, as opposed to the more narrow duty of disclosure, must identify a disclosure violation through which corporate fiduciaries misinformed stockholders and set forth allegations that support the remedy sought. A plaintiff then will have to plead causation and identify actual quantifiable damages in order to plead sufficiently this category of disclosure violation.

I reach the above conclusions from what now appears to be a distinction between "the fiduciary duty of disclosure" and disclosure violations that implicate fiduciary duties in the broad sense but do not involve communications that contemplate stockholder action.

In the Supreme Court's most recent opinion discussing the fiduciary duty of disclosure, the Court stated, "[a]n action for a breach of fiduciary duty arising out of disclosure violations in connection with a request for stockholder action does not include the elements of reliance, causation and actual quantifiable monetary damages." [19] In support of this statement, the Supreme Court cited the portions of *Cinerama Inc. v. Technicolor, Inc.*[20] and *In re Tri–Star Pictures, Inc. Litig.*[21] which stand for the proposition that under Delaware law there is a rule of *per se* damages for breach of the fiduciary duty of disclosure.[22] The Supreme Court also cited the portion of *Loudon v. Archer–Daniels–Midland Co.*[23] in which the Supreme Court limited *Tri–Star's per se* rule of damages to the narrow proposition that, "where directors have breached their disclosure duties in a corporate transaction that has in turn caused impairment to the economic or voting rights of stockholders, there must be at least be an award of nominal damages ...." I note that this express limitation of *Tri–Star's per se* rule of damages arose from the *Loudon* Court's desire to limit *Tri–Star* to the facts of *Tri–Star*, which the *Loudon* Court summarized as a, "case involving stockholder approval of an

**19.** *Malone,* 722 A.2d at 12.

**20.** Del.Supr., 663 A.2d at 1163.

**21.** Del.Supr., 634 A.2d 319, 333 (1993).

**22.** *Malone,* 722 A.2d at 12 n. 27.

**23.** Del.Supr., 700 A.2d 135, 142 (1997).

improperly manipulated transaction impli-
cating cash values and voting rights."[24]
*Malone* does not cite the portion of the
*Loudon* opinion in which the Supreme
Court addressed the pleading require-
ments for damages in the category of dis-
closure claims to which the limited *per se*
rule of damages did not apply under its
ruling (i.e. claims not involving stockholder
approval of an improperly manipulated
transaction through disclosure violations).
In that portion of *Loudon*, the Supreme
Court stated that damages would be
awarded in those disclosure claims only if
the disclosure violation impaired stock-
holder voting rights or deprived stockhold-
ers of their economic interests, and the
complaint contained well-pleaded allega-
tions sufficient to warrant the remedy
sought.[25] Through its limitation of *Tri-
Star's per se* rule of damages, the *Loudon*
Court distinguished between disclosure vi-
olations associated with stockholder action
and those that are not, strongly suggesting
that both types of disclosure violations im-
plicate the fiduciary duty of disclosure.
Unlike *Malone*, to follow, *Loudon* did not
narrowly limit the duty of disclosure to
stockholder action scenarios.

*Malone's* statement that causation and
actual quantifiable damages are not ele-
ments of a claim for breach of the fiduciary
duty of disclosure, and, more significantly,
its citations in support of that statement,
constitute a retreat to *Tri–Star's per se*
rule of damages for *all* violations of the
fiduciary duty of disclosure. While this
statement appears to be inconsistent with
*Loudon's* limitation of the *per se* rule of
damages and *Loudon's* heightened plead-
ing standard for claims of breach of the

fiduciary duty of disclosure not covered by
the limited *per se* rule of damages, any
such inconsistency becomes transparent
when one considers *Malone's* contempora-
neous limitation on the circumstances in
which the duty of disclosure applies. The
only salient distinction, then, between *Lou-
don* and *Malone* is the *Malone* Court's
couching the duty of disclosure in terms of
contemplated stockholder action and the
*Loudon* Court using a broader rubric en-
compassing all disclosure violations as vio-
lations of the "duty of disclosure," whether
stockholder action is contemplated or not.

Under *Malone*, the "duty of disclosure"
is implicated only in communications that
request stockholder action.[26] If a corpo-
rate fiduciary violates the duty of disclo-
sure, as *Malone* now narrowly defines that
duty, it is axiomatic that stockholders' vot-
ing rights are impaired. Even under *Lou-
don,* the stockholder would be entitled to
nominal damages. In essence, *Malone's*
explicit limitation of the duty of disclosure
to those instances in which stockholder
action is requested dispels the apparent
dichotomy that the Supreme Court created
in *Loudon* for the treatment of disclosure
violations arising out of communications
requesting stockholder action and disclo-
sure violations arising out of communica-
tions that do not request stockholder ac-
tion. This *per se* rule of damages for
violations of the duty of disclosure makes
sense so long as Delaware law continues to
attach value to a stockholder's right to
make an informed decision on corporate
affairs and continues to protect stockhold-
ers from the impairment of their voting
rights, even in the absence of quantifiable
economic harm to the stockholders.[27]

**24.** *Id.*

**25.** *Id.* at 147. It appears that under *Loudon's*
pleading standards even a claim for nominal
damages would need to be accompanied by
an allegation that the disclosure violation im-
paired stockholder voting rights or impaired
stockholders of their economic interests.
This view, however, is inconsistent with *Ma-
lone's* pronouncement that causation is not an

element of a claim for breach of the fiduciary
duty of disclosure.

**26.** *See infra* n. 15.

**27.** *See e.g., Malone*, 722 A.2d at 12; *Loudon*,
700 A.2d at 142 ("[W]here directors have
breached their disclosure duties in a corpo-
rate transaction that has in turn caused im-
pairment to the *economic or voting* rights of
stockholders, there must at least be an award

As has always been the case, since *Tri–Star's* pronouncement of the *per se* rule of damages for violations of the duty of disclosure, the *per se* rule of damages in this context encompasses only nominal damages.[28] In *Tri–Star* the Court suggested that a request for anything more than nominal damages (i.e. compensatory damages) would require substantive proof of those damages, most likely through an expert opinion.[29] The *Loudon* Court seemed to affirm this portion of *Tri–Star* when it said, "[i]n *every* case, a plaintiff stating a claim against directors for violation of the duty of disclosure must set forth in a well-pleaded complaint allegations sufficient to warrant the remedy sought."[30] Presumably, a claim for breach of the fiduciary duty of disclosure that sufficiently pleads the other specific elements of the breach arising from a false statement, omission, or partial disclosure will support a request for nominal damages, without the need to plead causation or actual quantifiable damages. Since *Malone* did not overrule *Loudon*, however, a plaintiff may want to allege impairment of stockholder voting rights or deprivation of stockholder economic interests in order to assure survival of even a claim limited to a request for nominal damages.[31] Under *Tri–Star*, a request for compensatory damages will have to be supported by allegations in the complaint sufficient to warrant the damages sought. Again, since *Malone* did not overrule *Loudon*, in order for a request for *compensatory damages* arising from a violation of the duty of disclosure to survive, a plaintiff will have to set-forth in a well-pleaded complaint allegations to support those damages.[32] As a result, causation and actual quantifiable damages are elements of the *compensatory damages portion* of a claim for breach of the fiduciary duty of disclosure. Following this Court's recent holding in *Brown v. Perrette, et al.*, furthermore, a well-pleaded request for more than nominal damages for breach of the duty of disclosure arising from the misdisclosure of wrongdoing that underlies an accompanying claim challenging the entire fairness of the same transaction will require a plaintiff to plead that the disclosure violation created a cognizable harm discrete from the harm caused by the underlying wrongdoing in the entire fairness claim, in order for the disclosure claim to survive a motion to dismiss.[33]

The *per se* rule of damages does not apply to disclosure violations that arise out of communications that do not contemplate stockholder action and that, therefore, implicate only the broader fiduciary

---

of nominal damages.") (emphasis added); *Tri–Star*, 634 A.2d at 333 ("[I]n all these cases, the courts recognized some value associated with a stockholder's right to make an informed decision on corporate affairs. That issue is squarely raised here.")

**28.** *See Loudon*, 700 A.2d at 142 ([T]he *Tri–Star* Court held that, under the circumstances of that case involving stockholder approval of an improperly manipulated transaction implicating cash values and voting rights, there should be some damage award. The [*Tri–Star*] Court cautioned, however, that if plaintiff sought more than nominal damages, proof (including expert testimony) would have to replace "hypothetical estimates.") (citations omitted); *See also Tri–Star*, 634 A.2d at 333–334 & n. 18.

**29.** *Id.* As a result, I think the rule is more appropriately termed "the *per se* rule of nominal damages."

**30.** *Loudon*, 700 A.2d at 147 (emphasis added).

**31.** *See id.; See also infra* n. 25.

**32.** I note that under *Tri–Star* it did not appear that at the pleading stage a request for compensatory damages needed to be supported by allegations sufficient to warrant those damages. *See Tri–Star*, 634 A.2d at 333–334 & n. 18.

**33.** Del.Ch., C.A. No. 13531, mem. op. at 14, 1999 WL 342340, Chandler, C. (May 14, 1999). I conclude that in order for *Brown* to be consistent with *Malone's* retreat to *per se* damages for breach of the now more narrow fiduciary duty of disclosure, *Brown's* holding on damages can only apply to compensatory damages—not both nominal *and* compensatory damages.

duties of loyalty, "good faith" and care and not the narrower fiduciary duty of disclosure. Disclosure claims based upon violations that do not implicate stockholder action are among the category of claims discussed in *Loudon*. *Loudon*, concluded that the per se rule of damages did not apply to disclosure claims arising out of communications that did not contemplate stockholder action. *Malone's* more narrow characterization of the "duty of disclosure" should have no impact on *Loudon's* treatment of these claims. Therefore, disclosure claims arising out of communications that do not contemplate stockholder action and which implicate only the broader fiduciary duties of loyalty, "good faith" and care, as opposed to the fiduciary duty of disclosure, must be supported, under *Loudon*, by a well-pleaded complaint with allegations sufficient to warrant the remedy sought, regardless of whether the requested remedies are for nominal damages, compensatory damages or some other type of relief. This rule makes sense because unlike a disclosure violation arising out of a communication contemplating stockholder action, which automatically impairs stockholder voting rights, a disclosure violation arising out of a communication that does not contemplate stockholder action neither automatically impairs stockholder voting rights nor automatically deprives stockholders of their economic interests.

With that exhausting, if not exhaustive, discussion in mind, I will turn to the sufficiency of O'Reilly's specific claims of breach of the fiduciary duty of disclosure.

### 1. O'Reilly's Claims of False Statements or Representations

 To state a claim for breach of the fiduciary duty of disclosure on the basis of a false statement or representation, a plaintiff must identify (1) a material statement or representation in a communication contemplating stockholder action (2) that is false.[34] If the plaintiff requests more than nominal damages, the complaint must allege facts sufficient to support the damages requested.[35] O'Reilly alleges that the Defendants made several false statements in the Proxy Statement.

### (a) Transworld's Purpose for Engaging in the Merger

O'Reilly alleges that the disclosure of Transworld's purpose for the Merger was materially false and misleading. The Proxy Statement described Transworld's intention to integrate HMI's business lines into Transworld's operations. O'Reilly asserts that this purpose was false, claiming that Transworld intended to sell, not synergize, HMI's assets. This disclosure claim is pleaded in three sequential versions:

(a) *Fraudulent intent at the time* – Transworld intended to sell HMI's assets to Counsel Corp. at the time it issued the Proxy Statement, but falsely reported otherwise.

---

**34.** Some cases imply in dicta that knowledge is an element of the breach of the fiduciary duty of disclosure through false or misleading statements. *See, e.g., Havens v. Attar*, Del. Ch., C.A. No. 15134, mem. op. at 19, 1997 WL 55957, Chandler, V.C. (Jan. 30, 1997); *Marhart, Inc. v. CalMat Co.*, Del.Ch., C.A. No. 11820, mem. op. at 7, 1992 WL 82365, Berger, V.C. (Apr. 22, 1992). I conclude that after *Malone* knowledge is no longer an element. The duty of disclosure itself requires directors, and presumably other corporate fiduciaries, "to provide shareholders with all information that is material to the action being requested and to provide a balanced, *truthful* account of all matters disclosed in the communications with shareholders." *Malone*, 722 A.2d at 12 (emphasis added). According to this statement, corporate fiduciaries have an obligation to confirm that statements in communications contemplating stockholder action are true before disseminating the communications to the stockholders. I note, however, that "knowledge" that the statement is false or misleading would be relevant to a claim to exempt directors from liability for the breach of the duty of disclosure pursuant to exculpatory charter provisions authorized by 8 *Del.C.* § 102(b)(7).

**35.** *See infra* p. 919.

(b) *Failure to update before vote on Merger* – The Proxy Statement was accurate at the time issued, but Transworld's plans changed materially when it learned of Counsel Corp.'s interest. Transworld failed to update its disclosure and inform HMI's stockholders of this material change in its purpose for engaging in the Merger before the stockholders voted on the Merger.

(c) *Failure to hold second vote on Merger* – O'Reilly alleges that if Transworld did not change its purpose for the Merger until after the HMI stockholders approved the Merger, that change of direction was such a fundamental event that not only should Transworld have disclosed the sale of assets to Counsel Corp., but the new plan triggered a duty to allow HMI's stockholders to vote on what had become a substantially different business plan underlying the Merger.

Defendants attack the first two versions of the disclosure claims for failure to allege that any agreement between Transworld and Counsel Corp. had been reached—or had even been discussed or contemplated—before the Proxy Statement was issued on June 16, 1997 or before the stockholders' meeting took place on July 11, 1997. Defendants argue that without this allegation, the Complaint fails to allege any facts to show that the Proxy Statement was false at the time it was issued or at the time of the July 11 stockholders' meeting. Contrary to Defendants' contention, however, O'Reilly does not need to allege the existence of a pre-July 11 agreement or discussions between Transworld and Counsel Corp. in order to maintain that the Proxy Statement's representations regarding Transworld's purpose for engaging in the Merger were false at the relevant times. Rather, O'Reilly must allege that Transworld's purpose on June 16 or July 11 for engaging in the Merger was to turn around and sell HMI's assets to Counsel Corp. at a profit following the Merger, or plead facts that can be construed reasonably to support that inference. While allegations that an agreement between Transworld and Counsel Corp. existed or allegations that discussions between Transworld and Counsel Corp. took place before July 11 would bolster O'Reilly's pleadings, those allegations are not necessary for this portion of O'Reilly's disclosure claim to survive this motion to dismiss. It certainly is possible that before July 11 Transworld intended to sell HMI's assets, but had refrained from contacting Counsel Corp. until the HMI stockholders approved the Merger under the alleged guise that Transworld intended to integrate HMI into its operations. Under this scenario, the Proxy Statement's representations would be false, despite the fact that Transworld had not yet had any contact with Counsel Corp.

 The Complaint pleads facts that support the inference that at the relevant times Transworld intended to sell HMI's assets following the Merger as opposed to integrating them into Transworld's operations. The Complaint alleges that: (i) between January 13, 1997 and March 13, 1997, Transworld informed HMI that it believed that the equity of HMI had no value, and that if Transworld did not already have a significant equity investment in HMI, it would no longer wish to pursue the Merger; (ii) on March 26, 1997, HMI and Transworld amended the Merger Agreement to reduce the Merger price from $1.50 to $0.30 in response to Transworld's March 13, 1997 "threat" that it would not pursue the Merger otherwise; (iii) on March 26, 1997, Counsel Corp. contacted HMI and expressed an interest in discussing the acquisition of a primary line of HMI's business; (iv) before issuing the Proxy Statement and despite Transworld's representation that it would prefer not to proceed with the Merger, Transworld represented to HMI that discussions between HMI and Counsel Corp. would place the Merger at risk; (v) the Proxy Statement was issued on June 16, 1997; (vi) the HMI

stockholders approved the Merger on July 11, 1997; (vii) on August 1, 1997, Transworld issued a press release stating that it had been unable to obtain the bank consent necessary to complete the Merger; and (viii) on August 14, 1997, Transworld announced that it had entered an agreement with Counsel Corp. relating to the sale of all of HMI's businesses and operations. A reasonable inference to draw from these allegations is that when Transworld learned, in March of 1997, of Counsel Corp.'s interest in acquiring a primary line of HMI's business, Transworld immediately began to plan the eventual sale of HMI's assets to Counsel Corp. Specifically, this inference is supported by the allegations that: (i) Transworld expressed disinterest in the Merger, (ii) Transworld then discouraged HMI from negotiating with Counsel Corp. upon Counsel Corp.'s expression of its interest in acquiring a primary line of HMI's business (an acquisition that could have released Transworld from the need to consummate the Merger); and, (iii) six weeks after the HMI stockholders approved the Merger, Transworld entered into an agreement with Counsel Corp. to sell HMI's assets to Counsel Corp. Again, while one could draw an inference from these allegations that is less favorable to O'Reilly, at this stage of the proceeding I am to draw all reasonable inferences from well-pleaded facts in the light most favorable to O'Reilly. I conclude, therefore, that O'Reilly has pleaded sufficiently that the Proxy Statement's representations regarding Transworld's purpose for engaging in the Merger were false at the relevant times.

▮ I also conclude that this alleged false statement is material. If in fact Transworld's purpose for engaging in the Merger was to sell HMI's assets to Counsel Corp., that is a fact that a reasonable stockholder would consider important in deciding how to vote. Since O'Reilly sufficiently pleads these two elements of this disclosure claim based on materially false statements, the Complaint sufficiently supports, under *Malone*, a request for at least nominal damages. In any event, O'Reilly pleads that the false statement, along with the other violations of the duty of disclosure, deprived HMI stockholders of their right to cast an informed vote and their right to make an informed investment decision in connection with the Merger.

▮ O'Reilly also pleads that this false statement, along with the other disclosure violations, caused a quantifiable economic loss to her and requests more than nominal damages. O'Reilly alleges that but for all of the disclosure violations, it is reasonably likely that Transworld would have ultimately been forced to pay $1.50 per share, as opposed to $.30 per share, to acquire HMI's publicly-held common stock. O'Reilly also alleges that the HMI stockholders suffered pecuniary economic damages of at least the difference between the value of the Merger consideration and HMI's fair value. Finally, O'Reilly alleges that Transworld and at least two of HMI's four directors obtained profits and benefits as a result of the Merger which constitute unjust enrichment which they are required to disgorge separate and apart from any transactional or pecuniary damages suffered by the HMI stockholders. These requests for additional damages, however, fall short of *Brown's* pleading requirement.[36] Count II of the Complaint challenges the fairness of the Merger and includes claims against Transworld for unfair dealing and usurpation of corporate opportunity. These claims encompass Defendants' alleged concealment from the HMI stockholders of Transworld's true purpose for engaging in the Merger, which, in turn, is the topic of the alleged false statement in this portion of O'Reilly's claim for breach of the fiduciary duty of disclosure. The alleged harm that resulted from the Defendants' violations of the duty of disclosure, however, is essentially the same as the alleged harm that was

36. *See infra* p. 918.

caused by the Defendants' wrongdoing underlying Count II's unfairness claim: an unfair price and a diversion to the Defendants of monies that belong to HMI. O'Reilly, therefore, fails to plead that the Defendants' misdisclosure of Transworld's purpose created a cognizable harm discrete from the alleged usurpation of corporate opportunity and unfair dealing that proper disclosure would have revealed. The compensatory damages that the HMI stockholders could be awarded if they succeed on their claims regarding the unfairness of the Merger would compensate the HMI stockholders for the harm alleged in this portion of the Complaint. As a result, I grant Defendants' motion with regard to O'Reilly's request for compensatory damages arising out of this portion of O'Reilly's disclosure claim, but I deny Defendants' motion to dismiss the remainder of the first two versions of this portion of O'Reilly's disclosure claim.

 Before leaving this portion of O'Reilly's disclosure claim, I note that O'Reilly's third variation on the same theme falls short of the mark. That version claims that in the event that the Proxy Statement's representations regarding Transworld's purpose for engaging in the Merger were accurate at the time the Proxy Statement was issued and at the time of the July 11 stockholders' meeting, Transworld should have permitted HMI to hold a second stockholder vote after Transworld decided to sell HMI's assets to Counsel Corp. This claim is really not a disclosure claim, but a novel proposition of fiduciary law. Defendants attack it as an unfounded one. O'Reilly, in her Answering Brief, glibly responds, "Plaintiff, of course, is not required to plead its legal theories."

Perhaps O'Reilly is not required to plead her legal theory with supporting argument, but unfortunately, a court forced to review the sufficiency of a pleading must address whether or not a legal basis for the claim in fact exists. I am aware of

no legal proposition, and O'Reilly fails to point to one, stating that stockholders of a target corporation are entitled to recast their votes on a merger·when the acquirer's planned use of the target changes after the target stockholders vote to approve the merger. Rather, Delaware law appears to be that when a merger is approved, and the stockholders tender their shares–barring fraud or other wrongdoing at the time of approval–the transaction cannot be undone. Thus, I conclude that this version of O'Reilly's first portion of her claim for breach of the fiduciary duty of disclosure fails to state a valid legal cause of action, and, therefore, I dismiss it.

### (b) Threats of Bankruptcy

 O'Reilly alleges that HMI coerced its stockholders into approving the Merger by falsely threatening bankruptcy if the deal fell apart. She points to Transworld's incremental extensions of HMI's forbearance agreement to illustrate that Transworld, as HMI's largest creditor, had too much invested in HMI to allow it to file for bankruptcy.

Defendants claim that HMI's default on the $49 million that it owed Transworld placed it in financial jeopardy at the time of the Merger offer. Those facts, they argue, fully support the proxy material's statement that in "the absence of the Merger, the Company will likely seek protection under the Federal bankruptcy laws." [37]

O'Reilly's pleadings do not support the proposition that this statement was false. HMI couched its prediction in terms of likelihood, so the mere presence of facts substantiating a reasonable opinion that HMI would file for bankruptcy defeats this claim. Those facts are found in O'Reilly's Complaint. She avers that HMI restated its financials, triggering a default under its debt agreements. She admits that after considering various options and concluding that a private placement was too time con-

---

37. Proxy Statement at 3.

suming, HMI turned to a merger as the solution for its financial troubles. From these facts alone, it is reasonable for HMI's decisionmakers to opine that they would file for bankruptcy if the Merger fell through. The facts that Transworld had a substantial amount of money invested in HMI, that Transworld had given HMI extensions on that debt up until the Merger (which I note was an overall part of the plan to consummate the Merger), that bankruptcy might be harmful to HMI and its creditors, and that Transworld did not immediately exercise its default rights when it learned that its lenders would not lend Transworld the money to consummate the Merger, do not support the inference that the HMI board did not believe that HMI would file for bankruptcy protection if HMI did not consummate the Merger. Accordingly, I dismiss this portion of O'Reilly's disclosure claim.

### (c) Contradictory Statements About HMI's Liquidation Value

■■■ O'Reilly claims the Proxy Statement contained inconsistent, contradictory statements as to whether HMI's board quantified (and relied upon) HMI's liquidation value in evaluating Transworld's final offer. She quotes two passages from the Proxy Statement in her Complaint:

> The Proxy Statement disclosed on page 13 that:

> Although the Board of Directors did not attempt to quantify the Company's liquidation value, the Board of Directors believed that the $0.30 per Share Merger Consideration is greater than the liquidation value with respect to shareholders.

> On page 15, the Proxy Statement then disclosed that:

> The Company's analysis [was] that in a liquidation of the Company the Company's stockholders would not receive any value....

She claims that one of these statements is false, or materially misleading at best. Defendants respond that a reading of the language surrounding these snippets reveals that this claim is carefully crafted hyperbole. They quote the following from the Proxy Statement:

> The Board of Directors noted that the Company had few tangible assets for which the Company can receive value in a liquidation. Although the Board of Directors did not attempt to quantify the Company's liquidation value, the Board of Directors believed that the $0.30 per Share Merger Consideration is greater than the liquidation value with respect to stockholders.

> (Proxy Statement at 13, ¶ 3)

> The Board of Directors considered the bankruptcy alternative on a number of occasions. Each time such alternative was discussed, the Board of Directors unanimously concluded the Merger was preferable to the bankruptcy alternative because:

> (1) The Stockholders were likely to receive less in a bankruptcy scenario than Transworld would be willing to offer. The determination was based on (a) the fact that potential acquirers that were proposing a purchase of the Company through a bankruptcy scenario were basing their proposal on the complete elimination of stockholder value; (b) the Company's analysis that in a liquidation of the Company [sic] the Company's stockholders would not receive any value; and (c) the directors belief that the Company's business would deteriorate substantially in any type of bankruptcy filing (see clauses (3), (4) and (5) below).

> * * *

> (Proxy Statement at p. 15).

Defendants are confident that when O'Reilly's snippets, which I underlined, are read in context, the purported inconsistency asserted by O'Reilly vanishes.

I agree with Defendants. An examination of their location reveals that the statements refer to sequential events. The quote from page 13 of the Proxy Statement refers to the HMI board's last min-

ute discussions of Transworld's final offer of $.30. The quote from page 15 of the Proxy Statement describes the HMI board's more careful deliberations "from May 1996 to mid-October 1996." [38] In other words, the board analyzed its options carefully at first, but when evaluating Transworld's final offer, it relied on "its familiarity with the Company's prospects and financial condition" to reach its conclusions without redoing some of the formal analysis presented to it at earlier stages.[39] When taken in context, O'Reilly's snippets are logical, chronological, and not inconsistent. Mischaracterizations of the Proxy Statement cannot support a claim for violation of the fiduciary duty of disclosure.[40] I, therefore, dismiss this portion of O'Reilly's disclosure claim.

#### (d) Arm's Length Negotiations

O'Reilly alleges the Proxy Statement's representation that Transworld and HMI's negotiations were "conducted on an arms length basis" was false. In the Complaint, she cites Webster's Ninth New Collegiate Dictionary: "The generally accepted definition of 'arms length' is 'the condition or fact that the parties to a transaction are independent and on an equal footing.'"

Defendants argue that this claim should be dismissed because all the facts upon which O'Reilly relies in claiming that the negotiations in fact were not "arm's length" are in the Proxy Statement. Defendants would like me to conclude, therefore, that despite the fact that the representation in the Proxy Statement that the negotiations were "conducted on an arm's length basis" may have been false, the Defendants have fulfilled their fiduciary duty of disclosure because the Proxy Statement provided sufficient information

for the stockholders to conclude that the statement was false. This proposition is completely inconsistent with Delaware's fiduciary duty of disclosure which requires corporate fiduciaries to "provide a balanced, truthful account of all matters disclosed in the communications with shareholders," [41] when requesting stockholder action. Stockholders should be entitled to rely on the truthfulness of statements in communications from corporate fiduciaries without having to question each representation against potentially conflicting statements or facts that would lead to conflicting conclusions.

Defendants' citation to *Wilen v. Pollution Control Indus.*[42] does not support their argument. *Wilen* involved an allegation that a proxy statement omitted disclosure that one of a corporation's directors was "subservient" to the corporation's acquirer.[43] This Court confirmed that the omission was not material because it was a legal conclusion and all of the underlying facts establishing the claim of subservience had been disclosed.[44] In this case, however, O'Reilly does not allege an omission of a legal conclusion. Rather, she alleges an affirmative misrepresentation of facts—the existence of "arm's length" negotiations—which cannot be cured by reference to underlying facts. Once the corporate fiduciaries in this case decided to take the next step and communicate whether or not the negotiations were "arm's length" (the omission of which *may* not have been material if the disclosure on Transworld's status and influence and the conflicts of two of HMI's four directors were an adequate basis for HMI's stockholders to conclude that the negotiations were not "arm's length"), they had a duty to do so truthfully. The fact that the Proxy Materials

---

38. Proxy Statement at 14.

39. Proxy Statement at 12.

40. *Noerr v. Greenwood,* Del.Ch., C.A. No. 14320, mem. at 17 & n. 33, 1997 WL 419633, Jacobs, V.C. (July 16, 1997).

41. *Malone,* 722 A.2d at 12.

42. Del.Ch., C.A. No. 7254, 1984 WL 8272, ltr. op. at 9–11, Hartnett, V.C. (Oct. 15, 1984).

43. *Id.*

44. *Id.* at 10–11.

contained adequate information for stockholders to conclude that this representation was false or questionable does not diminish the materiality of the false statement. Despite the presence of other contradictory information, there is a substantial likelihood that a reasonable investor relied on the "arm's length" statement in deciding to approve the Merger.

Defendants go on to challenge O'Reilly's definition of the term "arm's length" and argue that this claim is merely a disagreement over the definition of the term "arm's length," which, they claim is insufficient to support a disclosure claim. Regardless of the parties' preferred definition of the term "arm's length," O'Reilly's allegations, if true, would support a finding that in fact the negotiations were not "arm's length" and that the Proxy Statement's representation on this issue was false.

■■■■■ Again, because O'Reilly pleads that this statement was false, and material, she has a well pleaded claim for nominal damages arising from the alleged breach of the fiduciary duty of disclosure. For the same reasons set forth earlier in this opinion,[45] O'Reilly has failed to plead sufficiently her request for additional damages. One of the essential allegations underlying O'Reilly's claim in Count II that the Merger was unfair is that the Merger negotiations were not "arm's length," and resulted in unfair dealing and a usurpation of corporate opportunity by Transworld. O'Reilly's Complaint fails to plead *prima facie* facts that this false statement created a cognizable harm discrete from the harm caused by the alleged unfair negotiations that honest disclosure would have revealed and which also underlies O'Reilly's entire fairness claim. I, therefore, dismiss under *Brown* O'Reilly's request for compensatory damages arising out of this false statement, but I deny the Defendants' motion to dismiss the remainder of this portion of O'Reilly's disclosure claim.

#### (e) Funding source

■■■■ Although Defendants' brief does not address this claim, I raise this portion of O'Reilly's disclosure claim *sua sponte*. She alleges the statement, "Transworld will use available working capital to fund the Merger Consideration of approximately $2.8 million in the aggregate and expenses of approximately $1.7 million relating to the merger," was false because Transworld intended to either borrow the funds or raise it by selling HMI's assets. I dismiss this claim because so long as Transworld raised the cash it needed to buy HMI, the source was immaterial to the stockholders' vote. To the extent that this claim could be linked to an effort to conceal Transworld's purpose for engaging in the Merger, any concerns arising from that link will be addressed sufficiently by the disclosure claim that the statements regarding Transworld's purpose were false.

### 2. O'Reilly's Claim of Omission

■■■■ To state a claim for breach by omission of any duty to disclose, a plaintiff must plead facts identifying (1) material, (2) reasonably available (3) information that (4) was omitted from the proxy materials.[46] If the plaintiff requests more than nominal damages, the Complaint must allege facts sufficient to support the damages requested.[47]

#### (a) Stale Financials

For its most recent data, HMI relied on its unaudited financial statements for the fiscal quarter ending January 31, 1997. The Proxy Statement was dated June 16, 1997. O'Reilly contends that by the time the stockholders voted on the Merger, the

---

45. *See infra* pp. 921–22.

46. *Wolf v. Assaf,* Del.Ch., C.A. No. 15339, mem. op. at 4–5, 1998 WL 326662, Steele, V.C. (June 16, 1998).

47. *See infra* p. 918.

data was more than five months old. Defendants reply that the data was only four and one-half months old when the proxies went out. They believe the data was timely, noting that HMI's year-end report for its fiscal year ending April 30 was not due under SEC regulations until July 30, after the stockholders voted.

■■■■■ O'Reilly states a correct proposition of law. Stockholders must receive timely financial data when voting on a merger.[48] O'Reilly, nonetheless, fails to allege any facts substantiating that this data was not in fact recent. Under no set of circumstances inferable from her Complaint could I find that HMI's January 31 quarterly data was *materially* stale. In other words, O'Reilly fails to establish that more recent data existed that a stockholder would have found material to the Merger and which would have differed materially from what the stockholders actually received. Without some description of what was missing, the mere passage of four and a half months does not state a claim. It is incumbent upon O'Reilly to allege the basis for concluding that the data was false or materially misleading. The passage of time pleaded in the Complaint is insufficient in and of itself to establish that HMI's financial data was materially stale. I, therefore, dismiss this portion of O'Reilly's disclosure claim.

### 3. O'Reilly's Claims of Partial, Misleading Disclosures

■■■■■ To state a claim of partial, misleading disclosure, a plaintiff must plead facts identifying a(1) perhaps voluntary, but (2) materially incomplete (3) statement (4) made in conjunction with solicitation of stockholder action that (5) requires supplementation or clarification through (6) corrective disclosure of perhaps otherwise material, but reasonably available informa-

tion.[49] Again, if the plaintiff requests more than nominal damages, the complaint must allege facts sufficient to support the damages requested.[50]

### (a) Partially Disclosed Accounting Errors

■■■■ O'Reilly alleges that HMI did not adequately disclose the details of the accounting errors found in HMI's financial statements. The Complaint alleges that the HMI stockholders needed the substance of the analyses reviewed by the HMI board and Transworld. Specifically, the Complaint alleges that the HMI stockholders needed to know "exactly what the 'apparent errors' were, who made them, and why they were made, in order to assess whether those 'apparent errors' really constituted a valid basis to reduce the Merger price from $1.50 per share to $.30 per share." O'Reilly further alleges that the HMI stockholders needed this information in order to be able to assess the value of the claims HMI had against its accountants or others responsible for the accounting errors, claims that O'Reilly characterizes as HMI assets that can and must be taken into account when assessing HMI's fair value.

Defendants believe that the Proxy Statement adequately discloses HMI's accounting errors. Defendants point to the Proxy Statement, which states:

> In mid-February 1997, the Company was unable to correlate accounts payable relating to inventory with the amounts the vendors claimed were owed to them and with the expected gross profit for 1997 third quarter. The Company promptly shared its concern regarding this issue with Transworld.
> * * *
> On March 17, 1997, the Company announced that it planned to restate its

**48.** *See Barkan v. Amsted Indus.,* Del.Supr., 567 A.2d 1279, 1289 (1989).

**49.** *In re Walt Disney Co. Derivative Litig.,* Del. Ch., 731 A.2d 342, 377 (1998).

**50.** *See infra* p. 918.

financial statements for the first and second quarters of its 1997 fiscal year to correct certain errors relating to costs of goods sold, which were previously understated by approximately $1.8 million and $800,000, respectively, and that it planned to take a charge of approximately $13 million in the third quarter of 1997. The announcement detailed that the charge included a write-off of approximately $2.4 million in goodwill and other costs associated with the sale of retail pharmacies and an increase of approximately $10 million in the provision for doubtful accounts.[51]

I agree with Defendants.

The HMI board's request for stockholder action required the HMI board and Transworld to set forth material facts, that is, those facts for which "there is a substantial likelihood that a reasonable stockholder would consider them important in deciding how to vote."[52] Under this standard of materiality, I conclude that the details of the exact accounting errors, who made them and why they were made are immaterial to a reasonable stockholder's decision making process for voting on the Merger. In the absence of a reduction in the Merger price, the duty of disclosure would not require the Proxy Statement to set forth the details behind the financial statements that the target's and acquirer's respective boards used in arriving at the Merger price. The existence of an accounting error and the renegotiation of the Merger price on the basis of those errors should not turn minutia underlying the financial statements into material information. I cannot conclude that a reasonable stockholder would consider the exact details of the accounting errors, as opposed to the effects that the errors had on the financial data that stockholders typically use to evaluate the adequacy of a merger price, material in their decision to vote for or against the Merger. Finally, I fail to see how the details of who made the accounting errors and why they were made could factor into a reasonable stockholder's consideration of whether the Merger price, in light of these accounting errors, was fair.

O'Reilly also asserts that HMI's stockholders needed greater detail on these accounting errors in order to value any legal action that HMI might possess against whoever perpetrated the belatedly discovered accounting errors. The value of a just-discovered legal action is in most instances speculative. It is not readily reducible to a monetary figure, and if it is, the figure is often just an estimate, often an unreliable one. I do not consider *details* that would allow stockholders to evaluate the value of a just-discovered and somewhat uncertain legal action to be material. The Defendants' disclosure of the accounting errors was sufficient to place the HMI stockholders on notice that some sort of legal action might exist, to the extent that that information is material. I note that O'Reilly does not accuse HMI of breaching its fiduciary duty of disclosure for omitting that HMI had a potential lawsuit against certain parties as a result of the accounting errors or for omitting its own estimate of what that potential legal action might be worth. I dismiss this portion of O'Reilly's disclosure claim for failure to allege that the sought-after additional information was material.

### (b) Transworld's Pricing Methodology

 O'Reilly asserts that as HMI's controlling stockholder, Transworld had a duty to disclose the method by which it arrived at its final offer of $.30. Defendants claim that the Proxy Statement fully discloses the process by which Transworld arrived at its final offer: HMI discovered further accounting errors and told Transworld; Transworld concluded that HMI's equity was worthless; Transworld offered $.05 per share or threatened to terminate the deal; HMI countered with $1 per

---

**51.** Proxy Statement at 9–10.

**52.** *See infra* n. 17.

share; and Transworld responded with a final offer of $.30 per share.

I am convinced that Transworld and HMI adequately described the negotiation process by which the two parties reached agreement. O'Reilly cites no case that supports her assertion that Transworld must reveal its internal pricing methodology, in effect, a demand that it describe its negotiating strategy to HMI's stockholders. The circumstances by which Transworld and HMI arrived at agreement were adequately disclosed, and I cannot see how disclosure of Transworld's internal appraisal of HMI's financial report or its internal estimate of what HMI was worth to Transworld would materially benefit a stockholder deciding whether to approve or disapprove the Merger. The only information that the stockholder needed was what HMI's directors believed HMI was worth as a going concern, background on HMI's negotiations with Transworld, and what Transworld was offering for HMI's shares. The Proxy Statement adequately told HMI's stockholders all of this. O'Reilly fails to allege any evidence that the omitted information was material. I, therefore, dismiss this portion of O'Reilly's claim for breach of the fiduciary duty of disclosure.

### 4. O'Reilly's Hanging Materiality Allegation

I note that in the Complaint, O'Reilly wraps up her disclosure claims with the following section:

> HMI had been and was "for sale." Accordingly, HMI's directors' and Transworld's fiduciary duties of care and loyalty required them to act reasonably to seek and enter into the transaction providing the highest value reasonably available to HMI's stockholders. The facts and categories of facts outlined above, which were omitted and/or misstated, meet the materiality test because they were directly relevant to a reasonable stockholder's assessment of whether the Merger represented the highest value reasonably available to HMI's stockholders.

This language does not alter my findings that certain of the alleged misdisclosures were immaterial. First, O'Reilly fails to make any connection between the alleged misdisclosures and this alleged aspect of materiality—that is, how truthful or more extensive disclosure would have allowed HMI's stockholders to determine whether the Transworld offer represented the highest value reasonably available to them. Furthermore, while it is not necessary for the resolution of this motion, I note that it does not appear that the duty of disclosure would obligate corporate fiduciaries to disclose information regarding whether a merger represents the highest value available to a corporation when the corporation has received, or its directors have obtained, only one offer. While under certain circumstances a board's failure to obtain, through an auction of the company, the most valuable offer available to the stockholders *may* constitute a violation of their duties under *Revlon v. MacAndrews & Forbes Holdings, Inc.*,[53] the duty of disclosure does not appear to require them, when they have received only one offer, to disclose information from which the stockholders could assess whether the offer represents the highest value reasonably available to the company's stockholders, as opposed to whether the offer at issue represents fair value.

I note, furthermore, that this passage, from its context and lack of a heading, does not appear to be a separate claim. I, therefore, do not consider it to be a separate claim against the Defendants for breach of their fiduciary duties under *Revlon*. Any such claim would have to come through an amendment to the Complaint which more definitively sets forth the claim.

### D. O'Reilly's Entire Fairness Claim

O'Reilly's second Count in her Complaint claims that the Merger was the

---

53. Del.Supr., 506 A.2d 173, 182 (1985).

result of an unfair process that produced an unfair price. The Defendants' first argument was that an appraisal action was the only remedy available to O'Reilly. But Defendants' own admission in its briefs and my finding that O'Reilly has sufficiently pleaded certain aspects of her disclosure claims against the Defendants completely undermine that argument. Defendants further argue that I should dismiss O'Reilly's entire fairness claim because the Complaint has no well-pleaded facts challenging the fairness of the Merger. Defendants claim that O'Reilly's allegations regarding the unfairness of the Merger are merely conclusory.

O'Reilly, however, sufficiently pleads that the Merger was unfair. First, O'Reilly pleads that the Merger was a self-interested transaction. Transworld, as a controlling stockholder and acquirer of HMI's stock, certainly had an interest in the Merger. The Complaint also alleges, and the Proxy Statement admits, that two of HMI's four directors had interests arising from the elimination of HMI's need to file for bankruptcy in the event that the Merger was consummated and that one of those two directors also had an interest arising from contingency payments that he would receive from HMI if the Merger were consummated.

Second, the Complaint pleads that the Merger was the result of an "unfair process." The Complaint pleads facts from which it is reasonable to draw the inference that Transworld used its status as a large stockholder and creditor to coerce the HMI board into reducing the Merger price. The Complaint also alleges that Transworld prevented HMI from negotiating with Counsel Corp., and that Transworld usurped, to its benefit, the opportunity to sell HMI's assets to Counsel Corp., to Transworld's benefit. The Complaint,

furthermore, pleads that the Proxy Statement had materially false and misleading statements in it regarding Transworld's purpose for engaging in the Merger and the "arm's length" nature of the Merger negotiations.

Third, the Complaint pleads sufficiently that the $.30 Merger price was unfair. O'Reilly alleges that this price was one-half HMI's book value, that the reduction in price was more a result of Transworld's dominant status and the self-interests of Transworld and two of HMI's four directors than the accounting errors, and that but for the disclosure violations in the Proxy Statement, that the HMI stockholders would have received $1.50 per share. While these pleadings and allegations are sufficient to support O'Reilly's entire fairness claim, I note that it seems possible that the Defendants may be able to show that HMI acted under economic pressure, and after dealing with Transworld at arm's length, accepted the best deal available. At this juncture, however, my task is to determine whether O'Reilly has pled a *prima facie* claim of unfairness. I find that she has done so, and deny Defendants' motion to dismiss Count II.

### III. CONCLUSION

For the reasons stated above, I grant in part and deny in part Defendants' motion to dismiss Count I of the Complaint, and I deny Defendants' motion to dismiss Count II of the Complaint.