# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KYLE ELLIS, derivatively on behalf of ABBVIE, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2017-0342-SG |
| RICHARD A. GONZALEZ, ROBERT J. ALPERN, ROXANNE S. AUSTIN, WILLIAM H.L. BURNSIDE, EDWARD M. LIDDY, EDWARD J. RAPP, GLENN F. TILTON, ROY S. ROBERTS, and FREDERICK H. WADDELL, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| ABBVIE, INC., a Delaware Corporation, | ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 3, 2018
Date Decided: July 10, 2018

Blake A. Bennett, of COOCH & TAYLOR, PA., Wilmington, Delaware; OF COUNSEL: Francis A. Bottini, Jr. and Albert Y. Chang, of BOTTINI & BOTTINI, INC., La Jolla, California, *Attorneys for Plaintiff*.

Lisa A. Schmidt and Daniel E. Kaprow, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Robert J. Kopecky and Joshua Z. Rabinovitz, of KIRKLAND & ELLIS LLP, Chicago, Illinois, *Attorneys for Defendants and Nominal Defendant*.

GLASSCOCK, Vice Chancellor

This Memorandum Opinion takes yet another stroll through the legal thicket created by the ill-fated corporate inversion merger agreement between pharmaceutical giants AbbVie, Inc., a Delaware corporation, and Shire plc, a citizen of the island of Jersey. An important consideration for the merger, for AbbVie, was the tax savings it stood to realize under the tax laws of a foreign jurisdiction, rather than the United States. That consideration proved ephemeral; during pendency of the merger, the United States Treasury Department announced that it would reinterpret the law so that the tax savings, in part, would no longer be possible. Ultimately, the AbbVie board of directors reversed its recommendation that stockholders approve the merger, and Shire consented to depart the relationship as friends, a bittersweet sentiment no doubt made less bitter by AbbVie's payment of a $1.64 billion breakup fee. Litigation followed on several fronts.

The Plaintiff here is a stockholder of AbbVie. He seeks to sue the AbbVie board of directors on behalf of the corporation, derivatively. His theory is that AbbVie released misleading statements to the public and stockholders, both before and after the Treasury Department's announcement of its new "regulatory guidance" that bade to destroy the tax advantages of the merger. According to the Plaintiff, these statements were false, and resulted in damage to AbbVie. The Plaintiff failed to demand that the company undertake this litigation, as required by Court of Chancery Rule 23.1, but contends that demand should be excused here. The single

1

ground upon which he argues demand futility is that the Defendants face a substantial risk of liability in the litigation, and therefore are incapable of bringing their business judgment to bear on any such demand.

As this Court has had many occasions to point out, choses in action like the one at issue here are assets of the corporation, and like any asset are to be deployed according to the business judgment of the directors. Only where a plaintiff pleads specific facts which, if true (and with all reasonable inferences therefrom), demonstrate a substantial risk of liability to a majority of the board, will control of the litigation asset be stripped from the board and given to the putative derivative plaintiff.

Before me is the Defendants' Motion to Dismiss under Rule 23.1. The Plaintiff points to potential liability on the part of directors for statements made by the company when the merger was announced (and by the company's CEO soon thereafter), saying that tax advantages were but one of several reasons for the merger. He also points to statements by the CEO (and a Shire executive) immediately after the Treasury tax announcement, implying that the merger would go forward nonetheless. All these statements, per the Plaintiff, were false, and imply director liability. Because the AbbVie charter contains a clause exculpating the directors for all liability save for breach of the duty of loyalty, liability here attaches only if the directors acted in bad faith with respect to the statements. I find, even to the extent

2

that the Complaint adequately establishes that the statements were false or misleading, it is bare of non-conclusory allegations that a majority of AbbVie's directors knew of the false statements and nonetheless acted in bad faith. Because the Plaintiff has failed to plead an actionable breach of the duty of loyalty with respect to a majority of the Defendants, demand is not excused, and the Motion to Dismiss must be granted under Rule 23.1

My reasoning follows.

## I. BACKGROUND[1]

*A. Parties*

Nominal Defendant AbbVie, Inc. is a Delaware corporation headquartered in North Chicago, Illinois.[2] AbbVie, a biopharmaceutical company, was spun off from Abbott Laboratories in January 2013.[3] By the summer of 2014, AbbVie had become an international conglomerate with approximately 25,000 employees and a market capitalization of around $86 billion.[4] AbbVie's certificate of incorporation contains a Section 102(b)(7) provision that exculpates its directors from monetary liability for breaches of the duty of care.[5]

---

[1] The facts, drawn from the Plaintiff's Complaint and from other materials I may consider on a motion to dismiss, are presumed true for purposes of evaluating the Defendants' Motion to Dismiss.
[2] Compl. ¶ 10.
[3] *Id.* ¶¶ 1, 10.
[4] *Id.* ¶ 23.
[5] Kaprow Aff. Ex. 2, art. IX.

Defendant Richard A. Gonzalez has served as AbbVie's CEO and Chairman since 2013.[6] Defendants Robert J. Alpern, Roxanne S. Austin, William H.L. Burnside, Edward M. Liddy, Edward J. Rapp, Glenn F. Tilton, Roy S. Roberts, and Frederick H. Waddell (the "Director Defendants") served on AbbVie's board during the events described in the Complaint.[7] All of these individuals save Roberts were AbbVie directors when the Complaint was filed.[8]

Non-party Shire plc is a biopharmaceutical company incorporated in the Channel Island of Jersey.[9] Shire is headquartered in Dublin, Ireland.[10]

Plaintiff Kyle Ellis has held AbbVie stock continuously since January 2013.[11]

*B. Factual Background*

This case stems from AbbVie's proposed acquisition of Shire, which was abandoned after the United States Treasury Department announced in September 2014 that it would take steps to make so-called "inversion transactions"[12] less attractive.[13] The crux of the Complaint is that AbbVie's directors breached their

---

[6] Compl. ¶ 11.
[7] *Id.* ¶¶ 12–19.
[8] *Id.* ¶¶ 11–19.
[9] *Id.* ¶ 20.
[10] *Id.*
[11] *Id.* ¶ 9.
[12] "A corporate inversion is a corporate reorganization in which a company changes its country of residence by resituating its parent element in a foreign country. Inversions are—or were— attractive as a strategic business maneuver because they allow a corporation to adopt a foreign country's more favorable tax or corporate governance regime." *Southeastern Pa. Transp. Auth. v. AbbVie Inc.*, 2015 WL 1753033, at *2 (Del. Ch. Apr. 15, 2015), *aff'd*, 132 A.3d 1 (Del. 2016).
[13] Compl. ¶¶ 2–3, 56.

fiduciary duties by making material misrepresentations and omissions in connection with the botched acquisition.[14] While the Complaint exhaustively describes the negotiations leading up to the merger,[15] the details of those negotiations are largely irrelevant to the issues presented by the Defendants' Motion. I recite only those facts necessary to understand the Plaintiff's disclosure claims.

### 1. AbbVie and Shire Agree to Merge, and AbbVie Touts the Benefits of the Proposed Acquisition

After months of negotiations, on July 18, 2014, AbbVie and Shire entered into an agreement whereby AbbVie would acquire Shire for approximately $54 billion.[16] Under the agreement, AbbVie would form a wholly owned Jersey subsidiary ("New AbbVie"), acquire Shire for a mix of cash and New AbbVie stock, and convert AbbVie common stock into New AbbVie stock.[17] AbbVie and Shire would then become wholly owned subsidiaries of New AbbVie.[18] If AbbVie's board withdrew its support for the transaction, AbbVie would pay Shire a $1.64 billion termination fee.[19] This amount, though facially large, was an unremarkable 3% of deal value. If AbbVie's board did not withdraw its support, but AbbVie's stockholders nevertheless voted down the deal, AbbVie would pay Shire no less than $500 million

---

[14] *Id.* ¶¶ 3–4.
[15] *Id.* ¶¶ 75–110.
[16] *Id.* ¶¶ 44, 66, 83–110.
[17] *Id.* ¶ 2 n.1.
[18] *Id.*
[19] *Id.* ¶ 46.

and no more than $545 million to compensate Shire for costs incurred as part of the transaction.[20]

When AbbVie announced the agreement with Shire, it listed seven strategic rationales for the merger:

- Larger and more diversified biopharmaceutical company with multiple leading franchises.

- Adds leading franchises with specialty therapeutic areas, including rare disease and neurosciences.

- Broad and deep pipeline of diverse development programs and enhanced R&D capabilities.

- Global resources and experienced teams positioned to continue to deliver strong shareholder returns to both AbbVie and Shire shareholders.

- Transaction expected to achieve a competitive tax structure and provide New AbbVie with enhanced access to its global cash flows.

- Transaction expected to be accretive to adjusted EPS in the first year following completion, and will increase to more than $1.00 per share by 2020.

- Significant financial capacity for future acquisitions, investment and opportunity for enhanced shareholder distributions and value creation.[21]

Later, during a July 21, 2014 investor conference, AbbVie CEO Richard A. Gonzalez stated that the merger "has a significant, both strategic and financial,

---

[20] *Id.* ¶ 47.
[21] *Id.* ¶ 49 (emphasis omitted).

rationale. Tax is clearly a benefit, but it's not the primary rationale for this."[22] Gonzalez reiterated that the transaction "has compelling financial impact well beyond the tax impact," and that "[w]e would not be doing it if it was just for the tax impact."[23] According to Gonzalez, the tax impact was "an additional benefit that we have."[24]

One month after the investor conference, AbbVie filed a Form S-4 that listed ten rationales for the transaction, including "the combined financial strength and R&D experience of New AbbVie," and the "opportunity for New AbbVie to have an enhanced financial profile and greater strategic and financial flexibility as compared to AbbVie and Shire on a standalone basis."[25] As the Plaintiff points out, AbbVie mentioned tax benefits as only one of the justifications for the transaction, touting "the potential realization of tax and operational synergies by New AbbVie as a result of the Merger."[26] But the Complaint does not allege that the Form S-4 contained false or misleading statements; indeed, it contrasts the disclosures in the Form S-4 with Gonzalez's purportedly misleading statements at the July 21 investor conference.[27]

---

[22] *Id.* ¶ 50 (emphasis omitted).
[23] *Id.* ¶ 51 (emphasis omitted).
[24] *Id.* (emphasis omitted).
[25] *Id.* ¶ 52.
[26] *Id.*
[27] *Id.* ¶¶ 53–54.

### 2. The Regulatory Environment Shifts, and AbbVie Terminates the Merger

On September 22, 2014, the Treasury Department announced its plan to issue regulatory guidance that would eliminate some of the tax advantages of merger-based inversions.[28] The Treasury Department stated that the changes would "eliminate[] certain techniques inverted companies currently use to access the overseas earnings of foreign subsidiaries of the U.S. company that inverts without paying U.S. tax."[29] The summer before this announcement, there were signs that the United States government was considering steps to limit inversions.[30] For example, on August 5, 2014, the Treasury Department announced that it was "reviewing a broad range of authorities for possible administrative actions to limit inversions as well as approaches that could meaningfully reduce the tax benefits after inversions took place."[31]

According to the Plaintiff, the September 22 announcement "immediately caused AbbVie's Board to convene an emergency discussion about the effect of the [announcement] and whether AbbVie should continue with the Merger."[32] One week after the announcement, on September 29, AbbVie filed two Form 425s; one

---

[28] *Id.* ¶ 56.
[29] *Id.*
[30] *Id.* ¶¶ 40, 55.
[31] *Id.* ¶ 55. Despite the allegations of the Complaint, prior litigation over this unrequited merger has revealed that the Treasury Department's own public view of its ability to undertake such administrative action was unclear as of that time. *See AbbVie Inc.*, 2015 WL 1753033, at *7–8.
[32] Compl. ¶ 111.

contained a letter from Gonzalez to Shire's employees, and the other included a letter from AbbVie Vice President Chris C. Turek to AbbVie's employees.[33] Gonzalez said in his letter that he was "more energized than ever about our two companies coming together," that "[w]e have a very busy few months ahead as we work on integration planning," and that he "look[ed] forward to working with you much more closely in the near future."[34] Similarly, Turek wrote in his letter that the company would "concentrate on remaining requirements in a coordinated manner until [AbbVie and Shire] are fully integrated," and that "both integration planning teams are committed to successful preparation for Day One."[35] Neither the Form 425s nor the letters themselves were signed by any members of the AbbVie board.[36]

On October 14, AbbVie announced that the board intended to "reconsider the recommendation made on July 18, 2014 that AbbVie stockholders adopt the merger agreement needed to complete the proposed Merger of AbbVie and Shire."[37] The announcement noted that the AbbVie board would "consider, among other things, the impact of the U.S. Department of Treasury's proposed unilateral changes to the tax regulations announced on September 22, 2014, including the impact to the fundamental financial benefits of the transaction."[38] One day later, AbbVie issued

---

[33] *Id.* ¶¶ 60–61.
[34] *Id.* ¶ 60 (emphasis omitted).
[35] *Id.* ¶ 61 (emphasis omitted).
[36] Compl. Exs. 1, 2.
[37] Compl. ¶ 63.
[38] *Id.*

a press release announcing that the board had decided to withdraw its recommendation that stockholders vote in favor of the merger.[39] According to the press release, AbbVie and its board "made this determination following a detailed consideration of the impact of the U.S. Department of Treasury's unilateral changes to the tax rules."[40] Shire's stock price dropped from a closing price of $244.57 on October 14 to a low of $156.25 on October 15.[41]

On October 21, AbbVie issued another press release, this time to announce that AbbVie and Shire had agreed to terminate the proposed merger.[42] The announcement disclosed that AbbVie had agreed to pay Shire the $1.64 billion termination fee.[43] AbbVie explained that the changes proposed by the Treasury Department had "introduced an unacceptable level of risk and uncertainty given the magnitude of the proposed changes and the stated intention of the Department of Treasury to continue to revise tax principles to further impact such transactions."[44] Thus, "[t]he executive management team ultimately concluded that the transaction was no longer in the best interests of stockholders at the agreed upon valuation, and the Board fully supported that conclusion."[45]

---

[39] *Id.* ¶ 112.
[40] *Id.*
[41] *Id.* ¶ 6.
[42] *Id.* ¶ 65.
[43] *Id.*
[44] *Id.*
[45] *Id.*

### 3. The Securities Fraud Class Action

On November 25, 2014, several Shire stockholders filed a securities fraud class action against AbbVie and Gonzalez (the "Federal Action").[46] The complaint there alleged that AbbVie and Gonzalez had made several false and misleading statements in connection with the Shire merger, statements that supposedly downplayed the importance of tax benefits to the transaction.[47] On March 10, 2017, the court granted in part and denied in part the defendants' motion to dismiss, holding that the plaintiffs had stated a claim under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 based on Gonzalez's statements in the September 29, 2014 letter.[48] According to the court, the complaint supported a reasonable inference that "AbbVie's omission of the fact that it was reconsidering the merger rendered misleading Gonzalez's [September 29] statement about the continued planning for the transaction."[49] The court then held that the plaintiffs had adequately alleged scienter, finding it reasonable to infer that the September 29 letter "was made with a reckless disregard for the known or obvious danger of misleading buyers into believing that AbbVie still fully intended to go forward with the merger when, in

---

[46] *Id.* ¶ 67; *Rubinstein v. Gonzalez*, 241 F. Supp. 3d 841, 849 (N.D. Ill. 2017).

[47] *Rubinstein*, 241 F. Supp. 3d at 849.

[48] *Id.* at 856–57. The court had previously dismissed the complaint in its entirety without prejudice, following which the plaintiffs filed an amended complaint. *Rubinstein v. Gonzalez*, 2016 WL 1213931, at *1 (N.D. Ill. Mar. 29, 2016).

[49] *Rubinstein*, 241 F. Supp. 3d at 854.

11

fact, AbbVie was in the process of analyzing whether to walk away from the deal in light of the tax rule changes."[50]  The Federal Action remains pending.

*C. This Litigation*

The Plaintiff commenced this action on May 4, 2017.  The Complaint contains a single count for breach of fiduciary duties against the Defendants.[51]  According to the Plaintiff, the Defendants knowingly or recklessly issued false and misleading statements about the proposed transaction, and failed to promptly disclose that the AbbVie board was reconsidering the deal after the September 22, 2014 notice issued by the Treasury Department.[52]  On May 30, 2017, the Defendants moved to dismiss the Complaint under Court of Chancery Rule 23.1, arguing that the Plaintiff fails to adequately allege a majority of AbbVie's directors face a substantial likelihood of liability for breach of fiduciary duty.  I heard oral argument on that Motion on April 3, 2018.

## II. ANALYSIS

The Defendants seek dismissal of the Complaint under Court of Chancery Rule 23.1 for failure to make a demand.  The demand requirement is an extension of the fundamental principle that "directors, rather than shareholders, manage the

---

[50] *Id.* at 856.
[51] Compl. ¶¶ 131–36.
[52] *Id.* ¶ 134.

business and affairs of the corporation."[53]  Directors' control over a corporation embraces the disposition of its assets, including its choses in action.  Thus, under Rule 23.1, a derivative plaintiff must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[54]

Where, as here, the plaintiff has failed to make a presuit demand on the board, the Court must dismiss the complaint "unless it alleges particularized facts showing that demand would have been futile."[55]  The plaintiff's "pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a)."[56]  Under the heightened pleading requirements of Rule 23.1, conclusory "allegations of fact or law not supported by allegations of specific fact may not be taken as true."[57]  Nonetheless, the plaintiff is "entitled to all reasonable factual inferences that logically flow from the particularized facts alleged."[58]  In deciding a Rule 23.1

---

[53] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[54] Ct. Ch. R. 23.1(a).

[55] *Ryan v. Gursahaney*, 2015 WL 1915911, at *5 (Del. Ch. Apr. 28, 2015), *aff'd*, 128 A.3d 991 (Table) (Del. 2015).

[56] *Brehm*, 746 A.2d at 254.

[57] *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988), *overruled on other grounds by Brehm*, 746 A.2d 244.

[58] *Brehm*, 746 A.2d at 255.

motion, I am limited to "the well-pled allegations of the complaint, documents incorporated into the complaint by reference, and judicially noticed facts."[59]

This Court analyzes demand futility under the test set out in *Rales v. Blasband*.[60]  *Rales* requires a derivative plaintiff to allege particularized facts raising a reasonable doubt that, if a demand had been made, "the board of directors could have properly exercised its independent and disinterested business judgment in responding to [it]."[61]  *Aronson v. Lewis* addresses the subset of cases in which the plaintiff is challenging an action taken by the current board.[62]  To establish demand futility under *Aronson*, the plaintiff must allege particularized facts creating a reasonable doubt that "the directors are disinterested and independent" or the "challenged transaction was otherwise the product of a valid exercise of business judgment."[63]  The tests articulated in *Aronson* and *Rales* are "complementary versions of the same inquiry."[64]  That inquiry asks whether the board is capable of exercising its business judgment in considering a demand.[65]

---

[59] *Breedy-Fryson v. Towne Estates Condo. Owners Ass'n, Inc.*, 2010 WL 718619, at *9 (Del. Ch. Feb. 25, 2010).
[60] 634 A.2d 927 (Del. 1993).
[61] *Id.* at 934.
[62] *See id.* at 933–34 (explaining that *Aronson* does not apply unless the plaintiff is challenging a business decision by the board of directors that would be considering the demand).
[63] 473 A.2d at 814.
[64] *In re China Agritech, Inc. S'holder Derivative Litig.*, 2013 WL 2181514, at *16 (Del. Ch. May 21, 2013); *see also David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *4 (Del. Ch. Feb. 13, 2006) ("This court has held in the past that the *Rales* test, in reality, folds the two-pronged *Aronson* test into one broader examination.").
[65] *In re Duke Energy Corp. Derivative Litig.*, 2016 WL 4543788, at *14 (Del. Ch. Aug. 31, 2016).

Here, the Plaintiff does not argue that demand is futile because the Defendants have a financial interest in the conduct described in the Complaint, or because they lack independence from an interested party.[66] Instead, the Plaintiff claims that the Defendants cannot impartially consider a demand because they face a substantial likelihood of liability for AbbVie's making material misrepresentations and omissions in connection with the abandoned Shire acquisition. AbbVie's certificate of incorporation contains a Section 102(b)(7) clause that exculpates the directors from liability for duty-of-care violations. Thus, under either *Aronson* or *Rales*, the question here is the same: Does the Complaint adequately allege that a majority of AbbVie's board faces a substantial likelihood of liability for breaching the duty of loyalty?[67] Such a board, obviously, would be fatally conflicted in evaluating a demand.

---

[66] True, the Plaintiff argues that Gonzalez lacks independence because of his position as AbbVie's CEO, among other things. But to satisfy Rule 23.1, the Plaintiff must plead demand futility as to a majority of AbbVie's directors. *See, e.g.*, *Ryan v. Armstrong*, 2017 WL 2062902, at *10 (Del. Ch. May 15, 2017) (noting that the "crux" of the demand-futility inquiry is "whether the *majority* of the board, as it exists at the time the complaint is filed, is capable of considering the demand in light of the circumstances" (emphasis added)), *aff'd*, 176 A.3d 1274 (Table) (Del. 2017). Thus, the Plaintiff's allegations about Gonzalez are irrelevant unless the Plaintiff is able to allege with particularity that a majority of the AbbVie board faces a substantial likelihood of liability. I therefore focus on the demand-futility allegations relevant to a majority of the directors.

[67] *See Steinberg v. Bearden*, 2018 WL 2434558, at *7 n.54 (Del. Ch. May 30, 2018) ("Ultimately it is inconsequential which test applies [*i.e.*, *Rales* or *Aronson*], because under both *Rales* and *Aronson*, the relevant inquiry is whether Steinberg has pled sufficiently a non-exculpated claim for bad faith against a majority of the Board."); *see also Lenois v. Lawal*, 2017 WL 5289611, at *14 (Del. Ch. Nov. 7, 2017) ("[W]here an exculpatory charter provision exists, demand is excused as futile under the second prong of *Aronson* with a showing that a majority of the board faces a substantial likelihood of liability for non-exculpated claims."); *In re China Agritech, Inc. S'holder Derivative Litig.*, 2013 WL 2181514, at *16 ("A director cannot consider a litigation demand under

15

To establish a substantial likelihood of liability, a plaintiff need not "demonstrate a reasonable probability of success on the claim."[68]  Rather, the plaintiff must "make a threshold showing, through the allegation of particularized facts, that [its] claims have some merit."[69]  "This standard recognizes that the purpose of the particularity requirement is not to prevent derivative actions from going forward, but rather 'to ensure only derivative actions supported by a reasonable factual basis proceed.'"[70]

*A. Demand Is Not Futile as to the Disclosure Claims*

According to the Plaintiff, the Director Defendants face a substantial risk of liability for approving—or failing to correct—materially misleading statements regarding the proposed Shire transaction.  Specifically, the Plaintiff alleges that the Director Defendants (i) caused AbbVie and Gonzalez to make statements in July 2014 that downplayed the importance of tax benefits to the merger, even though those benefits were the primary rationale for pursuing the transaction; and (ii) knowingly failed to correct Gonzalez's and Turek's purportedly misleading statements in the Form 425s filed on September 29, 2014, thereby creating the impression that AbbVie was still committed to the merger even though, according

---

*Rales* if the director is interested in the alleged wrongdoing, not independent, or would face a 'substantial likelihood' of liability if suit were filed." (quoting *Rales*, 634 A.2d at 936)).

[68] *In re China Agritech, Inc. S'holder Derivative Litig.*, 2013 WL 2181514, at *16.

[69] *Rales*, 634 A.2d at 934.

[70] *In re China Agritech, Inc. S'holder Derivative Litig.*, 2013 WL 2181514, at *16 (quoting *In re Dow Chem. Co. Derivative Litig.*, 2010 WL 66769, at *6 (Del. Ch. Jan. 11, 2010)).

16

to the Plaintiff, the board had already begun reassessing the transaction. In my view, neither of these theories establishes that the Director Defendants face a substantial likelihood of liability for breaching the duty of loyalty. Thus, demand is not excused.

The duty of disclosure "is not an independent duty, but derives from the duties of care and loyalty."[71] Because the "scope and requirements" of the duty of disclosure "depend on context," Delaware law has developed specific rules for applying the duty in different factual scenarios.[72] Among those scenarios are (i) requests for stockholder action, (ii) communications outside the context of stockholder solicitation, (iii) attempts to seek ratification of transactions that do not require a stockholder vote, and (iv) direct sales or purchases of stock by corporate fiduciaries.[73] The statements at issue in this case were not made in the context of requests for stockholder action, and they did not relate to stock transactions or attempts to obtain ratification. Thus, the challenged communications fall within the *Malone v. Brincat* line of cases.[74]

---

[71] *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) (citation and internal quotation marks omitted).

[72] *In re Wayport, Inc. Litig.*, 76 A.3d 296, 314 (Del. Ch. 2013).

[73] *Id.* at 314–15.

[74] *See id.* at 315 ("A third scenario [in which the duty of disclosure is often invoked] involves a corporate fiduciary who speaks outside of the context of soliciting or recommending stockholder action, such as through 'public statements made to the market,' 'statements informing shareholders about the affairs of the corporation,' or public filings required by the federal securities laws." (quoting *Malone v. Brincat*, 722 A.2d 5, 11 (Del. 1998))).

*Malone* established that directors owe a duty not to knowingly disseminate false information to stockholders, even when the directors are not seeking stockholder action.[75] To plead a disclosure claim where there is no request for stockholder action, a plaintiff must allege that the directors "deliberately misinform[ed] shareholders about the business of the corporation, either directly or by a public statement."[76] As the *Malone* Court explained:

> Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty. It follows *a fortiori* that when directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty.[77]

Because AbbVie's charter contains a Section 102(b)(7) exculpatory provision, the Plaintiff here cannot establish demand futility based on his disclosure claims unless he "plead[s] particularized factual allegations that 'support the inference that the disclosure violation[s] w[ere] made *in bad faith, knowingly or intentionally*."[78]

---

[75] *Malone*, 722 A.2d at 9, 14.

[76] *Id.* at 14; *see also In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990 (Del. Ch. 2007) ("When a Delaware corporation communicates with its shareholders, even in the absence of a request for shareholder action, shareholders are entitled to honest communication from directors, given with complete candor and in good faith. Communications that depart from this expectation, particularly where it can be shown that the directors involved issued their communication with the knowledge that it was deceptive or incomplete, violate the fiduciary duties that protect shareholders. Such violations are sufficient to subject directors to liability in a derivative claim." (footnote omitted)).

[77] *Malone*, 722 A.2d at 10.

[78] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 132 (Del. Ch. 2009) (emphasis added) (quoting *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 915 (Del. Ch. Aug. 20, 1999)).

### 1. The July 2014 Statements

The first set of purported misstatements were made in July 2014. After AbbVie and Shire agreed to merge on July 18, 2014, AbbVie gave an investor presentation listing seven strategic rationales for the transaction. Only one of those rationales invoked tax benefits: "Transaction expected to achieve a competitive tax structure and provide New AbbVie with enhanced access to its global cash flows."[79] The other benefits of the transaction included "[b]road and deep pipeline of diverse development programs and enhanced R&D capabilities," and "[l]arger and more diversified biopharmaceutical company with multiple leading franchises."[80] Later, at a July 21 investor conference, Gonzalez said that tax benefits were "not the primary rationale for [the merger],"[81] and that "[w]e would not be doing it if it was just for the tax impact."[82] Gonzalez also claimed that the deal "has a significant, both strategic and financial, rationale."[83]

According to the Plaintiff, all of these statements were materially misleading because they downplayed the importance of tax benefits to the transaction. Indeed, the Plaintiff argues that tax savings were the primary justification for the merger, rendering misleading any statements that suggested otherwise. In my view,

---

[79] Compl. ¶ 49 (emphasis omitted).
[80] *Id.* (emphasis omitted).
[81] *Id.* ¶ 50 (emphasis omitted).
[82] *Id.* ¶ 51 (emphasis omitted).
[83] *Id.* ¶ 50 (emphasis omitted).

however, none of these statements gives rise to a substantial threat of personal liability for the Director Defendants.

First, the Complaint fails to adequately allege that any of these statements were false or misleading. The Plaintiff's theory of falsity rests on the premise that tax benefits were the sole, or at least primary, rationale for the merger. To support this premise, the Plaintiff points to AbbVie's October 15, 2014 press release. There, the company announced that the board had withdrawn its recommendation in favor of the merger "following a detailed consideration of the impact of the U.S. Department of Treasury's unilateral changes to the tax rules."[84] The Plaintiff argues that, because the limitation of tax benefits caused AbbVie's board to withdraw its support for the merger, those benefits must have provided the true, substantive rationale for the deal. But that is a specious argument. Tax advantages may have been a *necessary* component of the deal—that is, a benefit whose loss (or limitation) would make the merger untenable at the agreed-upon price. It does not follow, however, that tax benefits were the main (or only) reason AbbVie pursued the transaction.[85] And, contrary to the Plaintiff's conclusory allegation,[86] AbbVie did not suggest in July 2014 that the merger would close if the tax benefits fell away.

---

[84] *Id.* ¶ 112.

[85] *See AbbVie Inc.*, 2015 WL 1753033, at *15 n.122 ("[I]t is entirely possible that a corporation could want to pursue a transaction for several reasons, the loss of any of which would make the transaction no longer financially or strategically tenable.").

[86] *See* Compl. ¶ 54 ("Gonzalez and AbbVie's Board led the market to believe that AbbVie was committed to the Merger even if a subsequent change in the tax law were to occur.").

20

All AbbVie said was that tax savings were not sufficient, standing alone, to justify the merger, and that they were one among several considerations supporting the transaction. There was nothing inferentially false or misleading about that.

The court in *Rubinstein*—the securities fraud class action premised on essentially the same set of purported misstatements as the present case—recognized the flaw in the Plaintiff's theory of falsity. The *Rubinstein* court reasoned thus:

> [T]he total value of the deal was $54 billion. The break-up fee was $1.64 billion, or approximately 3% of the total value. Given this deal structure, it would be expected that AbbVie's loss of any benefit worth 3% or more of the total deal value could cause AbbVie to terminate the deal. But it does not follow that any benefit of the deal that is worth at least 3% of the transaction value must be the "primary"—*i.e.* the "most important"—reason for the deal. As the Court previously concluded, "[s]aying a benefit is not the 'primary rationale' is not the same as saying it is immaterial or unimportant."[87]

Indeed, for the Plaintiff's theory of falsity to succeed, he would have to plead with particularity that most of the value of the merger to AbbVie stemmed from the expected tax benefits, or specifically plead facts implying that the other reasons given were shams. The Plaintiff has not done so.

Moreover, the Plaintiff has failed to allege with particularity that the Director Defendants had any involvement with the July 2014 statements.[88] The Complaint

---

[87] *Rubinstein*, 241 F. Supp. 3d at 852–53 (second alteration in original) (citations and footnote omitted).

[88] *See In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d at 134 ("[T]he Complaint does not contain specific factual allegations that reasonably suggest sufficient board involvement in the preparation of the disclosures that would allow me to reasonably conclude that the director defendants face a substantial likelihood of personal liability.").

21

does not allege that the Director Defendants approved the announcement listing the seven rationales, let alone that they helped prepare it. Nor does the Complaint plead that the Director Defendants caused Gonzalez to make the purportedly misleading statements at the July 21 investor conference. Perhaps recognizing these pleading gaps, the Plaintiff asks me to infer the Director Defendants' involvement in the challenged statements from their role in negotiating the merger. It is true that the Director Defendants were actively involved in the merger negotiations, meeting several times in 2014 to discuss the proposed transaction. But that does not support a reasonable inference that the Director Defendants were responsible for the July 2014 statements.[89] Those particular statements aside, the Complaint does not even allege that the Director Defendants generally oversaw the preparation or dissemination of AbbVie's public statements regarding the proposed merger. Thus, even if the statements at issue were false (as I have held has been insufficiently pled), the lack of any well-pled allegations suggesting the Director Defendants' involvement with them would independently preclude a finding of demand futility.[90]

---

[89] *See Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008) ("The Court should draw all *reasonable* inferences in the plaintiff's favor. Such reasonable inferences must logically flow from particularized facts alleged by the plaintiff." (citation and internal quotation marks omitted)).

[90] The Plaintiff claims that the Defendants signed the Form S-4 filed on August 21, 2014. That is incorrect: the Form S-4 was signed by the directors of New AbbVie, who were not the same as the AbbVie directors. Kaprow Aff. Ex. 1, at 247. In any event, the Form S-4 is irrelevant, because the Complaint does not allege that it contained any misstatements. And even if the Complaint had made such an allegation, it would not help the Plaintiff, because there was nothing false or misleading about the Form S-4's listing tax benefits as one among ten rationales for the merger.

22

2. The Form 425s

The Plaintiff next points to the two letters AbbVie filed on Form 425 on September 29, 2017, one week after the Treasury Department announced its intention of eliminating some of the tax advantages of merger-based inversions. In one letter, Gonzalez said that he was "more energized than ever about our two companies coming together," that "[w]e have a very busy few months ahead as we work on integration planning," and that he "look[ed] forward to working with you much more closely in the near future."[91] In the other letter, Turek wrote that AbbVie would "concentrate on remaining requirements in a coordinated manner until [AbbVie and Shire] are fully integrated," and that "both integration planning teams are committed to successful preparation for Day One."[92] These letters were not signed by any of the Director Defendants.

At oral argument, the Plaintiff clarified his theory of liability with respect to these statements.[93] According to the Plaintiff, the September 29 letters were

---

[91] Compl. ¶ 60 (emphasis omitted).

[92] *Id.* ¶ 61 (emphasis omitted).

[93] *See* Apr. 3, 2018 Oral Arg. Tr. 39:4–16 ("THE COURT: All right. So your theory is even if that's true, even if it was true that the integration teams were still working, an investor would draw the inference that the board was not reconsidering because the integration teams were still working. Therefore, knowing that that false impression would be put out by the proxy, the board had a duty to reveal that it was considering whether it should go forward with the transaction in light of the tax change? MR. BOTTINI: Right. THE COURT: That's the theory? MR. BOTTINI: That's exactly right.").

Indeed, at oral argument, the Plaintiff apparently abandoned any argument that the July 2014 statements constituted actionable breaches of the duty of loyalty. *See id.* at 28:14–16 ("THE COURT: But you're not saying that a breach of duty arose before September 22nd? MR.

23

misleading because they gave the impression that AbbVie was fully committed to consummating the merger when, in fact, the board had convened an emergency meeting immediately after the September 22 announcement to discuss the impact of the proposed regulatory changes. In other words, stockholders reading the September 29 letters would have no inkling that the AbbVie board had already begun reconsidering its support for the merger. The Plaintiff alleges that the Director Defendants must have either had a hand in preparing the letters or become aware of them soon after they were issued. Either way, the Director Defendants breached the duty of loyalty by failing to promptly correct the misleading impression created by Gonzalez's and Turek's assurances that AbbVie was preparing for the merger. Of course, approximately two weeks after the September 29 letters, AbbVie in fact disclosed that the board was reassessing its support for the transaction. It is this theory—absent allegations of director breaches of loyalty—that survived a motion to dismiss in the Federal Action.[94]

---

BOTTINI: Right."). Nevertheless, for completeness' sake, I have addressed the Plaintiff's arguments regarding the pre-September 2014 statements.

[94] *See Rubinstein*, 241 F. Supp. 3d at 856 ("Taken together, these facts satisfy Plaintiffs' obligation to include in their complaint strong circumstantial evidence that Gonzales' September 29 statement was made with a reckless disregard for the known or obvious danger of misleading buyers into believing that AbbVie still fully intended to go forward with the merger when, in fact, AbbVie was in the process of analyzing whether to walk away from the deal in light of the tax rule changes. Therefore, the Court denies Defendants' motion to dismiss Plaintiffs' Section 10(b)/Rule 10b–5 claim to the extent that it is based on statements made in Gonzales' September 29, 2014 letter to Shire employees.").

The difficulty for the Plaintiff here is the lack of facts implying bad faith on the part of the Director Defendants. The Plaintiff speculates that the Director Defendants delayed disclosing their reassessment of the merger in order to save AbbVie millions of dollars in interest on the $1.64 billion termination fee the company would have to pay Shire. In other words, any failure of oversight was deliberate, not negligent, as demonstrated by this motive. The motive, however, is spurious. As the Complaint alleges, the termination fee was triggered only if the board withdrew or modified its recommendation in favor of the merger.[95] Thus, even if AbbVie had announced on the evening of September 22 that its board was reassessing the transaction, that would not have triggered the termination fee.[96] Avoiding interest cannot have motivated the Director Defendants to conceal facts that would not, in actuality, have started the interest clock.[97]

It is quite apparent that, until the board made a final decision, preparation for the merger must continue in light of the fourth-quarter closing date; nonetheless, the

---

[95] Compl. ¶ 46.

[96] *Cf. Rubinstein*, 241 F. Supp. 3d at 855–56 ("The Amended Complaint alleges that Gonzales's September 29 statement was made intentionally 'in an attempt to stave off an immediate $1.64 billion termination fee' and retain the interest on those funds for as long as possible. This allegation does not support a cogent and compelling inference of scienter, because the event triggering termination of the merger was the Board's withdrawal of its recommendation for the transaction, not Gonzales' statement." (citation omitted)).

[97] At oral argument, the Plaintiff's counsel conceded that the termination fee would not be triggered by an announcement that AbbVie's board was reassessing the merger. *See* April 3, 2018 Oral Arg. Tr. 54:9–13 ("THE COURT: I mean, even if the [AbbVie board] had said we're reconsidering, that wouldn't have triggered the break fee. MR. BOTTINI: No, no, no. That's correct.").

Plaintiff points to damages potentially arising from the failure to correct the misleading impression created by the September 29 letters. Specifically, the letters induced some Shire stockholders to hold on to their stock; those stockholders suffered losses when Shire stock plummeted following AbbVie's ultimate revelation that the board was reassessing the merger; and AbbVie has since been hit with lawsuits seeking recovery for those losses. The Plaintiff seeks to hold the Defendants personally liable in the event that any of the securities-fraud cases lead to a monetary judgment against the company.

This theory of liability is insufficient to establish demand futility. The Complaint fails to plead any particularized facts supporting a reasonable inference that the Director Defendants knew about the September 29 letters—much less that they signed off on them.[98] The Complaint makes the bald, conclusory allegation that the two letters were "reviewed and approved by the . . . Defendants."[99] But that allegation is not particularized enough to meet the heightened pleading requirements of Rule 23.1.[100] In *In re Citigroup Inc. Shareholder Derivative Litigation*, Chancellor Chandler was faced with similarly deficient allegations related to

---

[98] *See Steinberg*, 2018 WL 2434558, at *9 ("According to the Complaint, Bearden is the person who made the challenged statements during the November 4, 2015 earnings call and at the industry conference held on December 1, 2015 (*i.e.*, Statements # 2 and # 4). Critically, the Complaint fails to allege facts suggesting that any of the other six directors on the Board were present at these events or had any personal involvement in making any of these statements.").
[99] Compl. ¶¶ 60–61.
[100] *See Guttman v. Huang*, 823 A.2d 492, 499 (Del. Ch. 2003) ("Mere notice pleading is insufficient to meet the plaintiffs' burden to show demand excusal in a derivative case.").

26

purportedly misleading disclosures.[101] There, the plaintiffs alleged that the defendants had "caused or allowed" Citigroup to issue several misleading statements.[102] As Chancellor Chandler pointed out, however, "[p]leading that the director defendants 'caused" or 'caused or allowed' the Company to issue certain statements is not sufficient particularized pleading to excuse demand under Rule 23.1."[103] Such conclusory allegations were insufficient because they failed to describe "how the board was actually involved in creating or approving the statements, factual details that [were] crucial to determining whether demand on the board of directors would have been excused as futile."[104] So too for the Plaintiff's allegations here, which fail to provide any detail concerning the Director Defendants' purported involvement with the September 29 letters.

Nevertheless, the Plaintiff asks me to infer director knowledge from a cautionary statement in the Form 425s. Those filings disclose that "AbbVie, its directors and certain of its executive officers may be considered participants in the solicitation of proxies in connection with the transactions contemplated by the proxy statement/prospectus."[105] But that warning does not support a reasonable inference

---

[101] 964 A.2d at 133 n.88.

[102] *Id.*

[103] *Id.*; *see also In re China Auto. Sys. Inc. Derivative Litig.*, 2013 WL 4672059, at *8 (Del. Ch. Aug. 30, 2013) ("A mere statement that the Defendants 'caused' the filing of the allegedly misleading financial statements with the SEC is not, without more, a particularized allegation of fact." (footnote omitted)).

[104] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d at 133 n.88.

[105] Compl. Ex. 1, at 2; Compl. Ex. 2, at 2.

that the Director Defendants were responsible for the September 29 letters. First, the Form 425s make clear that they are "provided for informational purposes only and do[] not constitute an offer to sell, or an invitation to subscribe for, purchase or exchange, any securities or the solicitation of any vote or approval in any jurisdiction."[106] Thus, contrary to the Plaintiff's suggestion,[107] the Form 425s were not part of the proxy solicitation. More importantly, that the Director Defendants may have participated in soliciting proxies does not suggest they helped prepare (or even knew about) the two letters at issue here. Under Rule 23.1, more is required to adequately allege the Director Defendants' knowledge and bad faith.[108]

* * *

To reiterate, I assume, for purposes of this Memorandum Opinion, that the complained-of statements contained in the Gonzalez and Turek letters, included in the Form 425s, were misleading, and created the untrue impression that the merger would certainly close. Those statements should have been accompanied by a statement that the board was reassessing the merger, in light of tax consequences, to

---

[106] Compl. Ex. 1, at 2; Compl. Ex. 2, at 2.

[107] *See* April 3, 2018 Oral Arg. Tr. 35:2–3, 14–17 ("MR. BOTTINI: This [the Form 425] is considered part of the solicitation for the proxy. . . . So this document is telling the market that this is -- the reason it's being filed as a Form 425 with the SEC, it's part of the proxy solicitation process.").

[108] The Plaintiff also argues that knowledge can be inferred from the Director Defendants' role in negotiating the merger. But again, that is an unreasonable inference, and the Complaint fails to allege any particularized facts suggesting that the AbbVie board was regularly reviewing public statements about the transaction.

28

avoid being misleading. Nonetheless, to demonstrate demand futility, the Complaint must also aver specific facts from which I may infer a substantial risk of Director Defendant liability arising from those statements. In light of the exculpation clause, it is not enough to allege that the misleading statements occurred on these directors' watch; nor is it enough to plead facts from which I may infer negligence, or even gross negligence, in the directors' failure to cure the misimpression caused by the statements. Instead, the Plaintiff's burden is to plead non-conclusory facts from which (drawing all plaintiff-friendly inferences) I may infer bad faith. This, the Plaintiff has not done. All I can glean from the Complaint is that the Gonzalez and Turek letters issued at a time when the Director Defendants were in fact re-evaluating the merger, and that the letters created the incorrect impression that the merger would surely close. This misimpression presumably persisted for two weeks, until the board released a statement that it was formally reconsidering the merger. I cannot, on those facts, conclude that the Director Defendants acted in bad faith. Because the Complaint fails to plead that the Director Defendants breached the duty of loyalty by making (or failing to correct) misleading statements in connection with the Shire transaction, they do not face a substantial likelihood of liability. Accordingly, demand is not excused on the basis of the alleged disclosure violations.

*B. The Remaining Demand-Futility Arguments*

The Plaintiff offers two additional demand-futility arguments. First, the Plaintiff argues that demand is futile because some of the Defendants served on the board's Audit Committee, which has "oversight responsibility with respect to AbbVie's accounting and financial reporting practices and the quality and integrity of AbbVie's financial statements."[109] But that argument runs up against the well-settled rule that mere membership on a board committee is insufficient to support a reasonable inference of disloyal conduct.[110] In any event, the communications at issue here are not AbbVie's financial statements; they are statements concerning the rationales for the transaction and the company's commitment to the deal in the face of regulatory changes. Second, the Plaintiff contends that demand is excused because AbbVie's directors-and-officers insurance policy does not provide coverage for actions the company brings against its directors. This Court has previously rejected that theory of demand futility, describing it as a "variation[] on the 'directors suing themselves' and 'participating in the wrongs' refrain."[111] I agree with that

---

[109] Compl. ¶ 128.

[110] *See, e.g.*, *In re China Auto. Sys. Inc. Derivative Litig.*, 2013 WL 4672059, at *8 ("Mere membership on the Audit Committee is not enough for the Court to infer bad faith."); *South v. Baker*, 62 A.3d 1, 17 (Del. Ch. 2012) ("As numerous Delaware decisions make clear, an allegation that the underlying cause of a corporate trauma falls within the delegated authority of a board committee does not support an inference that the directors on that committee knew of and consciously disregarded the problem for purposes of Rule 23.1.").

[111] *Decker v. Clausen*, 1989 WL 133617, at *2 (Del. Ch. Nov. 6, 1989).

analysis.  Because the Plaintiff has failed to adequately allege that demand is excused, the Complaint must be dismissed.

*C. Leave to Amend*

The Plaintiff seeks leave to amend his Complaint in the event that the Court grants the Defendants' Motion.  But the Plaintiff has not even attempted to make the required showing of "good cause why dismissal with prejudice would not be just under all the circumstances."[112]  Moreover, nothing indicates that denying leave to amend here would be unjust.[113]  Thus, the dismissal of the Plaintiff's Complaint will be with prejudice.[114]

### III. CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss is granted.  An appropriate order is attached.

---

[112] *TVI Corp. v. Gallagher*, 2013 WL 5809271, at *21 (Del. Ch. Oct. 28, 2013).

[113] *See E. Sussex Assocs., LLC v. W. Sussex Assocs., LLC*, 2013 WL 2389868, at *1 (Del. Ch. June 3, 2013) (noting that Rule 15(aaa) is "intended to conserve litigants' and judicial resources by discouraging a party from briefing a dispositive motion before filing an amended complaint").

[114] *See* Ct. Ch. R. 15(aaa) ("In the event a party fails to timely file an amended complaint or motion to amend under this subsection (aaa) and the Court thereafter concludes that the complaint should be dismissed under Rule 12(b)(6) or 23.1, such dismissal shall be with prejudice (and in the case of complaints brought pursuant to Rules 23 or 23.1 with prejudice to the named plaintiffs only) unless the Court, for good cause shown, shall find that dismissal with prejudice would not be just under all the circumstances."); *Larkin v. Shah*, 2016 WL 4485447, at *21 (Del. Ch. Aug. 25, 2016) (denying a perfunctory request for leave to amend under Rule 15(aaa) because "Plaintiffs have not shown, or even attempted to show, good cause as to why dismissal with prejudice would be unjust").

31

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

KYLE ELLIS, derivatively on behalf of )
ABBVIE, INC., )
                                     )
               Plaintiff, )
                                       )
                                       )
       v. )  C.A. No. 2017-0291-SG
                                       )
                                       )
RICHARD A. GONZALEZ, ROBERT J. )
ALPERN, ROXANNE S. AUSTIN, )
WILLIAM H.L. BURNSIDE, EDWARD )
M. LIDDY, EDWARD J. RAPP, )
GLENN F. TILTON, ROY S. )
ROBERTS, and FREDERICK H. )
WADDELL, )
                                       )
            Defendants, )
                                       )
and )
                                       )
ABBVIE, INC., a Delaware Corporation, )
                                       )
      Nominal Defendant. )

## **ORDER**

AND NOW, this 10th day of July, 2018,

The Court having considered the Defendants' Motion to Dismiss, and for the reasons set forth in the Memorandum Opinion dated July 10, 2018, IT IS HEREBY ORDERED that the Motion to Dismiss is GRANTED.

SO ORDERED:

<u>/s/ Sam Glasscock III</u>

Vice Chancellor